Under an indictment for murder in the first degree appellant was convicted of murder in the second degree and the jury fixed her punishment at ten years imprisonment in the penitentiary. She was represented at arraignment and trial by court-appointed counsel. She pleaded not guilty and not guilty by reason of insanity. She was furnished a free transcript and trial counsel was appointed to represent her on appeal.
The evidence is undisputed that in the early morning hours on March 30, 1975, appellant shot and killed Danny Woods in a drinking place known as "Ann's Place" in the City limits of Anniston, Alabama.
Mrs. Roberts testified that around 2:00 or 2:30 o'clock on Easter morning she recalled that there were a number of people in her establishment including appellant and the *Page 409 
deceased; that the deceased came into her place on Friday afternoon and stayed the entire weekend except that he left the place for about an hour on Saturday. Appellant arrived at Ann's Place on Saturday night around 9:00. From that time until the shooting occurred both appellant and the deceased were drinking beer. The deceased was playing cards with several men while appellant was seated at a table behind the deceased. During this whole period of time Mrs. Roberts observed appellant and the deceased having a brief conversation in which appellant asked the deceased if he was mad at her because she had married Mac Siskey, to which the deceased replied, "No, that is not none of my business." Appellant got up and moved in front of the deceased and reached in her pocketbook and pulled a pistol. After she had the pistol in her hand she said "Danny", and shot him one time in the chest. After being shot Danny Woods took a few steps toward the front door and fell. Several of the men present put Woods in an automobile to carry him to the hospital but he died before they got him to the hospital.
After the shooting Mrs. Roberts and several men rushed over to appellant and took the pistol from her and asked her why she shot Woods and she said, "You know why — I shot him because of the man I love — Mac Siskey."
Several persons present at the time of the shooting testified that they did not see a weapon of any kind on the deceased and that he did not threaten or make an overt act toward appellant before she pulled the pistol and shot him. One State witness testified that he was asleep on a bowling machine and was awakened by a shot. He jumped up and hollered, "What is going on," and saw Woods walking towards the door and he said, "Gene, she shot me." This witness heard Mrs. Roberts ask appellant, "What did you shoot him for?" and appellant replied, "Because of what he done to the man I love."
Mr. Ralph Phillips, Calhoun County Coroner, was called and he went to the emergency room at the Regional Medical Center to examine Woods. He said that Woods was dead when he arrived at the hospital. He carried the body to the mortuary at the State Department of Toxicology at Auburn. He drew some samples of blood from the body of the deceased and personally delivered them to Mr. John M. Case at the State laboratory at Jacksonville. Mr. Case testified that he conducted a laboratory test on the blood samples which revealed 0.08 percent of ethyl alcohol in the blood of the deceased.
Dr. James M. Buttram, a toxicologist for the State of Alabama, testified that he performed an autopsy and determined that the cause of death was massive internal hemorrhage or loss of blood as a result of a gunshot wound to the right chest.
Appellant did not testify in her behalf. The thrust of her entire defense was based upon insanity. Appellant's brother testified that she had attempted to commit suicide on several occasions by cutting her wrists but not deep enough to require sutures. That she had taken an overdose of pills on two occasions, had previously shot herself, and had taken rat poisoning.
Dr. Sam Crawford, a psychiatrist, testified that he first saw appellant on May 31, 1975, because she had taken rat poisoning and that the ingestion of rat poisoning could be fatal if treatment was not administered immediately. She was turned over to him for treatment and consultation after she had recovered from the ingestion of rat poisoning. Dr. Crawford's analysis was that appellant had a ten year history of depression, multiple suicidal attempts with self-inflicted wounds, and a very intense desire to die. He characterized her problem as "manic depressive." Dr. Crawford stated this is a chemical abnormality which occurs in some individuals and "usually these people have no control over what they are doing to themselves or someone else."
The State's objections to Dr. Crawford's being allowed to answer if this shooting was an irresistible impulse, and to whether appellant knew right from wrong, were sustained. On further interrogation, however, the doctor was permitted to testify that a *Page 410 
patient with appellant's problems may commit acts of irresistible impulse and may not know right from wrong.
From the record:
 "Q. All right, sir. It is your testimony that a patient with a diseased mind, as you have testified to, such as Shirley Hafley, as a matter of fact, may, from time to time, commit an act because of an irresistible impulse, and may not, as a matter of fact, even know or be able to consider what's right and what's wrong; is that right?"
"A. That's what I feel; yes."
The doctor went on to testify that in his opinion appellant was in command of her capabilities enough to assist in her defense and deal appropriately with what was happening.
We have carefully read and considered Dr. Crawford's testimony and taken in the light most favorable to appellant it was his opinion that appellant had mental problems which he termed "manic depressive."
This falls far short of clearly establishing that at the time of the commission of the crime appellant was afflicted with a diseased mind to the extent that (1) she did not know right from wrong as applied to the particular act in question, or (2) if she did have such knowledge, she, nevertheless, by reason of the duress of such mental disease had so far lost the power to select the right and to avoid doing the act in question as that her free agency was at the time destroyed, and (3) that, at the same time, the crime was so connected with such mental disease, in the relation of cause and effect, as to have been the product of it solely — which is the legal test. Parsons v.State, 81 Ala. 577, 2 So. 854; Barbour v. State, 262 Ala. 297,78 So.2d 328.
Appellant introduced into evidence, without objection, the medical records of appellant at Bryce Hospital and the Mental Health Center in Anniston. We have studied these records with consuming interest and nowhere in these records does it appear that appellant was psychotic at any time — either on admission or at the time the crime was committed. The records at Bryce Hospital do show that appellant was addicted to alcohol and to an excessive degree.
Title 15, Section 422, Code of Alabama 1940, provides that every person over fourteen years of age charged with a crime is presumed to be responsible for his acts and the burden of proving that he or she is not responsible is cast upon the accused and must be proved to the reasonable satisfaction of the jury. Hockenberry v. State, 246 Ala. 369, 20 So.2d 533;Reedy v. State, 246 Ala. 363, 20 So.2d 528; Lokos v. State,278 Ala. 586, 179 So.2d 714.
The rule is well settled that opinion evidence of medical experts, though uncontradicted, is not sufficient to take the question of insanity from the jury, but must be weighed like other evidence. It is within the province of the jury to reject such evidence in toto. Carr v. State, 43 Ala. App. 642,198 So.2d 791; Luster v. State, 45 Ala. App. 19, 221 So.2d 695;Hockenberry v. State, supra.
During the Court's oral charge to the jury he made the following comment:
 "I notice one case, I believe it was written by Justice Stone, the Opinion in the Supreme Court of Alabama, that says that, `Even a vagrant or tramp is entitled to the same justice that the most respected citizen would have.' That is not a comment by me as to any of these witnesses or parties litigating here yesterday and today; it is a quotation from Chief Justice Stone indicating that no matter the worth or importance or lack of it in the final results of the case justice is involved and that that makes it important. If a jury takes a light view of cases and continues to do so, actually we would have to change the system in some way; possibly have a bench of three judges, or make some other change other than to make the county itself responsible for the kind of justice that the citizens of the county receive. So, I very earnestly urge you to give this case every consideration."
At the conclusion of the oral charge the trial judge asked if there were any exceptions. Appellant's counsel requested that *Page 411 
the jury be excluded from the courtroom. This request was granted and after the jury left the courtroom the following occurred:
 "MR. WILSON: I want to except to the statement made by Your Honor prior to the actual charge in which you said that there were four possible verdicts, one was life, one was one year, and one was acquittal by reason of not guilty and one was acquittal by reason of not guilty because of insanity, because the statement infers — maybe you cleared it up by a later statement — that there is no difference between one year and life. The second one I want to object to is the statement that Your Honor made preliminary to the charge in which you said these words, or these words in effect, in which you were admonishing the Jury and in effect you said these words, `Do not take a light view of this case because if this system fails we would have to go to a different system, possibly one in which three judges would make decisions, or some other means of determining guilt of a party.' My reason for excepting to that, that places undue burden — it is a coercive statement to the Jury which may or may not, but certainly may have the effect of making them feel that they have a pressure to bring back a guilty verdict.
 "THE COURT: Well, you may be exactly right; but all I can say about that is I can't think of any greater punishment than to be reversed for saying that.
"MR. WILSON: That doesn't help me and my client much.
 "THE COURT: What is done is done. I mean that type of thing, if it does create a pressure, one-sided pressure, then I don't see any way it can be eradicated. It would have to go on to the next court."
We cannot fathom the reason for the trial judge charging the jury as he did. Only the judge knows his reasons for doing so. We cannot even speculate on this matter. However, we do not perceive that appellant was harmed or prejudiced in any manner. This was a cold blooded murder without any mitigating or extenuating circumstances. She shot and killed a defenseless man who, according to the evidence, had given her no reason to resort to the use of a weapon and gun him down while he was sitting at a table playing a game of cards. It seems to us that if the jury had been prejudiced by the Court's remarks they would have not shown so much leniency in fixing her punishment for such an unprovoked and murderous assault upon the deceased.
Be that as it may, we believe this case is controlled by Coxv. State, 280 Ala. 318, 193 So.2d 759, wherein the Court said:
 "Defendant takes the position in his brief that he cannot waive the right to have the jury correctly charged. We disagree. The orderly conduct of a trial requires some sort of rule of procedure. The rule should afford the party a fair opportunity to take exception to the charge if the party desire to do so. To aid the administration of justice, the exception should be taken at a time when the court may correct the error in the charge.
 "In the instant case, defendant and his counsel were present in court. They heard the oral charge. Defendant then had the burden and the opportunity to state defendant's objections to the court before the jury retired to determine their verdict. So far as we are advised, that rule has always been followed in this state. To allow defendant to complain of error in the charge at a later time would give him the opportunity to be aware of the court's error, but to remain silent, speculate on a favorable verdict, and in the event of an unfavorable verdict to obtain reversal on a ground which defendant deliberately chose not to raise by exception taken at the appointed time." (Emphasis supplied)
We have carefully searched the record for errors injuriously affecting the substantial rights of appellant and have found none.
The judgment of conviction is affirmed.
AFFIRMED.
All the judges concur, except CATES, P.J., who concurs in the result. *Page 412