HARRIS, Judge.
In 1972 appellant was convicted of murder in the second degree under an indictment charging murder in the first degree. The jury fixed his punishment at twenty years in the penitentiary. He appealed this conviction and the case was reversed. Lowery v. State, 55 Ala.App. 511, 317 So.2d 357; 294 Ala. 347, 317 So.2d 360; 55 Ala.App. 514, 317 So.2d 365.
When the case was called for retrial the State struck the charge of murder in the first degree and proceeded to trial on the charge of murder in the second degree to which charge appellant pleaded not guilty. He was again found guilty of murder in the second degree and the jury fixed his punishment at twenty years in the penitentiary. He has been represented by retained counsel throughout all of these proceedings.
The evidence was in sharp conflict which made a clear-cut case for the jury to resolve. The major issue presented on this appeal is whether the trial court properly charged the jury on the element of malice. The record clearly shows that at the conclusion of the oral charge appellant stated to the Court that he desired to take up some matter outside the presence of the jury. After the jury was excluded, appellant reserved certain exceptions to the Court’s oral charge. The law is well settled in this State that exceptions to the oral charge, or any part of it, to be availing, must be taken and reserved in the presence of the jury and before the jury retires. Ennis v. State, 37 Ala.App. 716, 76 So.2d 183; Owens v. State, 53 Ala.App. 553, 302 So.2d 240; Franklin v. State, 45 Ala.App. 27, 221 So.2d 919; Cox v. State, 280 Ala. 318, 193 So.2d 759.
It is not disputed that the deceased, James T. Parham, was shot by appellant on the night of May 13,1972, outside the Golden Nugget, a nightclub located across the highway from Gunter Field in Montgomery County, Alabama. Parham was carried to a local hospital where he became a patient of Dr. William H. Chambliss who performed three surgical operations on him in an attempt to save his life. Parham’s condition deteriorated to the point that Dr. Chambliss referred him to Dr. James Hollanback at the University Hospital in Birmingham where he subsequently died.
Dr. Richard A. Roper, Director of the Montgomery Regional Laboratory of the State Department of Toxicology, performed a postmortem examination on the body of Parham to determine the cause of death. This witness stated his educational background, training and experience. He stated that the autopsy was performed in the presence of a pathologist and that he and the pathologist were in complete agreement that the cause of death resulted from a massive infection of the gastric-intestinal tract which was consistent with a gunshot wound that penetrated the intestines a number of times. Photographs of the body of Parham were made during the autopsy and two of these were admitted into evidence over appellant’s objections.
Officer Harold Hicken of the Montgomery Police Department was assigned to investigate the shooting at the Golden Nug *799 get. He described in detail the layout of the premises where the shooting occurred and identified photographs of the nightclub. He stated he found a club made from a cue stick under the front of an automobile that was parked near the front door of the club. He said that Mr. Parham had already been carried to the hospital when he arrived at the scene. Hicken further testified that the front door had at least one bullet hole in it. He stated that the next night or two he found another club in the parking lot of the Golden Nugget, but he did not see it the night of the shooting and did not know how long it had been on the parking lot.
Joel Wesley Lambert testified that he arrived at the Golden Nugget between 10:30 and 11:00 p.m. on the night of the shooting. He stated that he first noticed appellant playing pool at one of the two pool tables in the place. Lambert started playing pool on the other pool table. In order to make a shot Lambert asked appellant, who was in his way, to move, by saying, “excuse me.” At this point appellant told Lambert, “Boy, if I has a face like that, I’d go get some pills for it.” Lambert said again, “Excuse me,” and appellant said, “Did you hear me,_, I said if I had a face like that, I would go get some pills.” Lambert replied, “One thing about it, they don’t make pills for your face.” When Lambert made this statement, appellant made a move to strike Lambert with his fist and Lambert struck appellant in his face with the cue stick causing his nose to bleed. A number of men present, including the deceased and the bartender James Hudson, came over and broke up the fight. The deceased told appellant to leave the place. Appellant had come to the Golden Nugget that night with a couple — Bill Heartsill and Carol Ryals, and when the deceased told appellant to leave, he walked out of the place with this couple.
Lambert further testified that when the trio got outside, appellant was cursing and trying to get Lambert to come out of the building. The deceased told appellant again to leave and he remembered that he had dropped some beer he had purchased before the fight and the deceased told him to get his beer and leave. Lambert said he helped them pick up the beer and gave it to them and they walked out of the place. Carol Ryals kept saying they should not be made to leave and they did not start the trouble. Appellant was still trying to get Lambert to come outside. Lambert went to the door and looked outside. James Hudson was standing in the door to keep the people inside the place and the deceased was standing just outside the door. The deceased told appellant again to leave. At this point, according to Lambert, appellant pulled a pistol from under his shirt and started firing. Hudson was shot in the side and elbow. Parham was shot in the abdomen and walked behind a car parked at the front door and fell. He remained where he fell until the ambulance came and got him. After the shooting appellant and his two companions ran to their car and drove away.
On cross-examination Lambert admitted that he had previously been convicted of forgery and that he was a good friend of both the deceased and James Hudson. He denied making any remarks to Heartsill about the scars on his face but admitted that Heartsill had some bad looking scars.
James Hudson testified that he had a full-time job as an appliance salesman and was a part-time bartender at the Golden Nugget. He stated that he first noticed appellant the night of the shooting when he came to the bar to buy a six-pack of beer and the waitress gave him the wrong kind and he asked her to exchange it for another kind. Hudson was mixing drinks and noticed appellant because of the manner in which he spoke to the waitress.
Hudson next observed appellant when there was a disturbance and fight involving appellant, Lambert and Chuck Norton. He saw Lambert strike appellant in the face with a cue stick. Hudson and the deceased went to break up the fight. They stopped the fight and the deceased told appellant to leave. Carol Ryals kept urging appellant to stay and fight once they. were outside. Carol and Heartsill went back inside the *800 club to get the beer that appellant dropped on the floor during the fight. Appellant remained outside arguing with Lambert who was still inside the place, about who started the fight and kept trying to get Lambert to come outside so they could fight. The deceased told appellant that he did not care who started the fight, he wanted him to leave. Hudson was standing in the doorway with his club — pool cue in his hand — but he did not use it to strike anyone. He further testified that the deceased did not have a weapon of any kind; that appellant kept trying to get the fight started again and the deceased started toward appellant. At that point the shooting began and both Hudson and the deceased were shot.
On cross-examination Hudson testified that the only weapons in the Golden Nugget the night of the shooting were the end of a cue stick and an unloaded pistol.
Mr. John W. Wilson testified that in May of 1972 he worked part time at the Golden Nugget. His job was to check membership cards and to have people register before they were permitted to enter the club. That he was on duty the night of the shooting. He remembered appellant and Lambert arguing and fighting at the pool tables and a number of people intervened and broke up the fight. Appellant and his friends went outside and began shouting to Lambert on the inside urging him to come outside and fight. He stated that the deceased and Hudson came to the front door and told appellant and his friends to leave. He said he thought the deceased and Hudson had billy clubs. He heard appellant and the deceased arguing and the deceased and Hudson started to go outside. At that time Wilson said he heard three to five shots and saw that Hudson was hit. He did not see the deceased when he was shot as he was to the left of the door and out of his vision. He further testified that he had never seen the deceased use a club on anyone during the time he worked there.
Bill Heartsill testified that he and appellant were good friends and that on the night of May 13, 1972, he delivered to appellant a pistol which he had agreed to sell him a week before. He delivered the pistol to appellant at Fort Deposit just before they got in the car to come to Montgomery. Appellant stuck the pistol in his pocket. They went by Carol Ryals’ house and stayed a few hours and then they came to Montgomery. Carol called a friend of hers trying to get appellant a date but was unsuccessful. They went to the Satellite Nightclub on the Southern Bypass where they had some beer to drink. They decided to go the Golden Nugget where Carol and Heart-sill danced and later Carol played pool. Appellant moved around in the dance hall trying to find a dance partner. His activities were reported to Hudson who went up to appellant and accused him of being a trouble maker. He further testified that they started to leave and appellant went to the bar and purchased a six-pack of beer to carry with them. On the way out someone said something to Heartsill about the scars on his face and appellant asked what was wrong and was hit in the face with a cue stick. He further stated that two or three men jumped on appellant and struck him with their fists. The fight was broken up and appellant and his friends were asked to leave. After they got outside the club, Heartsill remembered the beer that had been dropped during the fight inside and he went back to get it.
Heartsill further said that Lambert was at the door cursing and screaming about what he was going to do to appellant, and appellant was inviting Lambert outside to finish the fight. This witness further testified that Hudson came out and struck appellant across the forehead with a cue stick and both Hudson and the deceased went after appellant and began hitting him until the shots were fired by appellant. He claimed that appellant was cornered against a car in the parking lot and there was no way for him to escape.
Carol Ryals testified substantially to the same story as Heartsill except that she did not hear anyone make any statements about the scars on Heartsill’s face. She did not remember going back into the club to *801 get the beer and she denied that she encouraged appellant to stay and fight after the deceased told them to leave.
Appellant testified in his behalf and stated that he had a permit to carry the pistol he purchased from Heartsill. He said he didn’t have any trouble at the Golden Nugget until he got ready to leave. On the way out of the club Heartsill stopped before they got to the door and appeared to be talking to someone. That he asked what was going on and was hit in the head with a cue stick and several men hit him with their fists. That he and his two friends walked out of the club. He further testified that while they were outside the club Lambert appeared in the door waving a cue stick and threatening to beat him up. He stated that the deceased and Hudson were also in the doorway and were shouting at him and then he was knocked down with a club. He claimed he did not remember shooting his pistol but he suddenly realized he had it in his hand. He said that because of the crowded conditions of the parking lot he had no way to escape but he managed to get to Heartsill’s car. They left the Golden Nugget and went to Greenville and to his mother’s house and contacted an attorney. The next day he returned to Montgomery and surrendered to the police.
The trial judge in this ease charged the jury on malice in the following language: “Malice in law doesn’t necessarily mean hate or ill-will, but is defined as an unlawful act willfully done without just cause or legal excuse. That is, it’s that mental state of condition which prompts the doing of an unlawful act without legal justification or extension.” It is obvious to us that the underlined word extension, was meant to be “extenuation,” and this was a typographical error and as so treated the Court’s oral charge is correct. It is identical with the charge in Patterson v. State, 156 Ala. 62, 47 So. 52, cited with approval by the Supreme Court in reversing this Court when this case was originally here on appeal. See Lowery v. State, 294 Ala. 347, 317 So.2d 360.
The trial court gave at the request of appellant seventeen written charges and refused eight. We have carefully considered the refused charges in the light of the oral charge and the given charges and find that the refused charges were substantially covered in the oral charge and many of the given charges. Title 7, Section 273, Code of Alabama 1940.
We are not too impressed with appellant’s plea of self-defense. He had ample time to leave the premises of the Golden Nugget when he was asked to do so and several minutes before the shooting. Instead of leaving he remained outside the door and kept urging Lambert to come out and finish the fight. However, the trial court fully charged the jury on the law of self-defense and also gave the following written charge at appellant’s request:
“It is not necessary under the evidence in this case that the defendant should have been actually in danger of death or great bodily harm at the time he shot the deceased in order for him to be justified in shooting the victim. He had the right to act on the appearance of things at the time, taken in the light of all the evidence. He had the right to interpret the conduct of the victim in the light of any threats that the evidence shows the victim to have made against him. If the circumstances attending the incident were such as to justify a reasonable man in the belief that he was in danger of great bodily harm or death and he honestly believed such to be the case, and there was not open to him any avenue or retreat without enhancing his danger or the circumstances were such that a reasonable man would not have deemed that retreat was safe, then he had the right to shoot the victim in his own defense, although as a matter of fact he was not in actual danger. If you believe that the defendant acted under such conditions and circumstances, the burden of showing that he was not free from fault in bringing in the difficulty is on the State, and if not shown you must acquit the defendant.”
*802 We have carefully searched the record for errors which injuriously affected the substantial rights of appellant and have found none.
The judgment of conviction is affirmed.
AFFIRMED.
All the Judges concur, except CATES, J., who concurs in the result.