Appellant was convicted of murder in the first degree and the jury fixed his punishment at life imprisonment in the penitentiary. He was represented by court-appointed counsel and executed a waiver of arraignment form, and pleaded not guilty and not guilty by reason of insanity. After sentence was imposed, he gave notice of appeal and was furnished a free transcript. Trial counsel was appointed to represent him on appeal.
On August 15, 1975, appellant's counsel filed a motion to have him committed to Bryce Hospital for an evaluation and determination as to his competency to stand trial and to make a determination as to his sanity at the time of the alleged offense. This motion was granted. He was committed to Bryce Hospital on September 15, 1975. He was discharged from Bryce to the custody of the Sheriff of Montgomery County, Alabama on January 16, 1976, as "competent." This discharge report was signed by "G.G. Ochoa, Level 1-A Psychiatrist, with recommendation that he be returned to Court, and is able to cooperate in his defense."
The hospitalization summary from Bryce states, in pertinent part, "The patient was given a more descriptive diagnosis of his condition-295.73, Schizophrenia, Schizo-affective type, Excited, on 1-8-76, Mr. Hurst was seen by treatment team members at which time he requested to be returned to jail to stand trial for charges of murder. After interviewing Mr. Hurst, it was felt that he understood the charges against him and could aid his lawyer in his defense. It was recommended that arrangements be made for his return to Court. Mr. Hurst was discharged on 1-16-76 to the Montgomery Sheriff's Department."
Appellant was committed to Bryce Hospital by Honorable Perry O. Hooper, one of the Circuit Judges of Montgomery County, and on January 12, 1976, the Superintendent of Bryce wrote Judge Hooper saying:
 "On September 22, 1975, Arthur Hurst was admitted to Bryce Hospital under Title 15, Section 426, by your order.
 "Since that time, he has been evaluated by the Forensic Board and has received treatment by the staff of Extended Treatment Program, Level 1-A. The staff now feels that Mr. Hurst is `restored to his right mind' and able to assist in his defense.
 "We respectfully await the arrival of your duly appointed officer to take Mr. Hurst back into custody for further proceedings before the Court."
Upon appellant's return to Court, trial was begun on May 10, 1976.
Bertha Mae McClain testified that on May 14, and 15, 1975, she lived at 438 North Bainbridge in Montgomery with the deceased, her three children, and appellant, her brother. McClain had lived with the deceased for twelve and a half years and considered him to be her husband. She stated that appellant, at the time of deceased's death had lived with them for approximately six months.
McClain testified that her brother owned a pistol and that he had it for a month before the shooting occurred. Appellant told McClain that he had gotten the gun at Max's Pawn Shop and that he would kill somebody with it.
A few nights before the deceased was killed, McClain testified, she and the deceased had an argument. McClain had bought some "dope" for a "guy" and had brought it home where it was to be picked up. The deceased told McClain that he didn't want any drugs around the children. At this time appellant entered into the argument, exclaiming, "Why you jump on my sister, man. You ain't got nothing to do with it." The deceased and appellant began to scuffle, but McClain stopped them. The deceased ran and got a wrench and appellant locked himself in the bathroom. Deceased told appellant, "Come out, you ______ ______, I'm going to kill you." McClain stated that she calmed deceased down and no further trouble resulted that night.
During the late hours of May 14, 1975, or the early morning hours of May 15, 1975, McClain was visiting near her home. One *Page 1227 
of her children summoned her home. McClain heard shooting, entered her home and found appellant standing at the kitchen table loading a pistol, saying, "Come on, you ______ ______ I'll kill you." She found Leonard Harris lying in front of the stereo in the living room. He had been shot. McClain told appellant to leave Harris alone and then called the police.
Mrs. McClain testified that appellant had been in mental institutions on four occasions. Appellant was committed to Rockland Hospital in New York on two occasions and twice in Bryce.
W.T. Sheriff testified that he was in the Patrol Division of the Montgomery Police Department in May of 1975. He stated that he investigated a shooting incident shortly after midnight on May 15, 1975. Sheriff testified that when he arrived on the scene appellant approached his car with a gun in his hand. Appellant told Sheriff, "I shot him. He hit me in the privates, and I shot him." Sheriff took the gun from appellant and went into the house. There he found Harris dead on the floor, surrounded by a pool of blood. Sheriff summoned an ambulance and the detective division. Shortly afterwards, an ambulance and Officers Rutland and Norton of the detective division arrived on the scene.
Lawrence Rutland testified that he was a detective with the Montgomery Police Department on May 15, 1975. He stated he investigated a shooting at 423 North Bainbridge Street. He received a pistol from Officer Sheriff which he marked and sent to the toxicologist's office.
Out of the presence of the jury, Rutland testified that he read appellant his rights and appellant signed a waiver form at 1:50 a.m. Appellant told Rutland that he understood his rights. At that time appellant gave a written statement which he signed after Rutland read it to him. In pertinent part the statement reads as follows:
 "City of Montgomery, Alabama, Department of Police; name, Arthur Hurst; place detective office; date, 5/15/75; time, 1:50 a.m.; charge, murder.
 "Before asking you any questions, I must explain to you that you can remain silent, that anything you say can be used against you in court, that you can talk to a lawyer first and that you have the right to the advice and presence of a lawyer even though you cannot afford to hire one. If you cannot afford to hire a lawyer and want to have one present during interrogation, the court will appoint one before we question you. If you want to answer questions now, you can do so, but you can stop answering at any time.' And it's signed by me, L.G. Rutland. "I fully understand the foregoing statement and do willingly agree to answer questions. I understand and know what I am doing. No promise or threats have been made to me by anyone and no pressure of any kind has been made against me by anyone.' And it's signed Arthur James Hurst, witnessed by H.C. Norton."
Rutland testified that he had no knowledge that appellant had ever been in a mental institution.
Appellant then called Bradley Adams, Ph.D., out of the presence of the jury. Adams testified that he was a clinical psychologist at Bryce Hospital. Adams received a Ph.D., in clinical psychology from the University of Alabama. Over the thirteen years of his employment at Bryce as a clinical psychologist, Adams treated "virtually thousands" of patients.
Adams stated that appellant was under his supervision for approximately one month in December, 1975. The Forensic Evaluation Board at Bryce diagnosed appellant's problem as schizophrenia, paranoid type on November 26, 1975. Having decided that appellant required extended treatment, the Board transferred him to Adams' supervision.
Based on appellant's medical records at Bryce, information from a mental institution in New York, his interactions with appellant, and knowledge of how schizophrenics of the paranoid type "maintain themselves," Adams formed an opinion of appellant's mental condition on May 15, 1975. From the record: *Page 1228 
"BY MR. MEMORY:
"Q. Would you give us that opinion?
 "A. It was our opinion and my — and I certainly concur that it is my opinion — that Mr. Hurst was in a psychotic state, that he was — his behaviors were determined emotionally, and that he was unable to control himself in terms of the commission of a crime.
 "Q. Was he in a position to be able to determine the difference between right and wrong?
 "A. Mr. Hurst knows right and wrong. It is our opinion that he was not able to adhere to the right at that time.
"Q. And so your answer would be what?
"A. Well ___
"Q. At that time, meaning May 15th, 1975?
"A. Yes, sir.
 "Q. Was he able to distinguish between right and wrong ___
"A. No, sir.
"Q. — if he could not distinguish right?
"A. No.
 "Q. And if at that time he could not distinguish between right and wrong, could he intelligently and voluntarily make a statement?
"THE COURT: Did he have the mental capacity to do it?
"MR. MEMORY: Right.
 "Q. (By Mr. Memory) Did he have the mental capacity to give a statement ___
"A. Competently?
 "Q. To waive his rights as a citizen of the United States to voluntarily give a statement?
"A. I would say no."
Dr. Adams further testified that a person suffering from the disorder afflicting appellant could give a statement as appellant did in the case. This behavior would be consistent with the delusional system occurring in such persons.
Adams stated that he believed appellant willingly gave his statement to police. However, from the record:
 "THE COURT: Did he have a mental capacity to know what he was doing or realize what he was doing?
 "THE WITNESS: Your Honor, it's my opinion that he would not have the mental capacity to appreciate the ramifications of what he was doing, the future consequences; that his delusional system would require him to do this at that time in order to be a man."
Such a statement, Adams testified, was consistent with appellant's "life style." From the record:
"Q. And explain his life style, please sir.
 "A. It's one of grandiose, fantasy, and religious preoccupation, and with this primary drive of `I am a man and will be and will prove it in every way that I can at any given opportunity.'
 "Q. And isn't it also consistent with a normal person to desire to be a man and to act in a man-like manner?
 "A. Well, all I could say is the ones that do it like Mr. Hurst frequently come to Bryce Hospital, because it's a very bizarre fashion.
 "Q. And those persons do not knowingly give statements to the police?
 "A. Well, I've already said that in terms of understanding the ramifications, the future consequences, of this behavior, my answer is he did not; in my opinion. I wasn't there."
According to Adams, the fact that appellant was advised that his statement would be used against him in court was not a warning to "someone like that." Adams testified that he would be very surprised if the statement was made in a lucid interval. He stated that it was conceivable and possible but highly unlikely.
The trial court allowed the statement into evidence over the objection of appellant.
Rutland was then recalled after the jury returned. Miranda
and voluntariness predicates were laid and appellant's confessory statement was read to the jury over appellant's objection.
"May 15, 1975 2:10 a.m.
 "This is a statement from Arthur Hurst about the shooting that happened at 438 *Page 1229 
N. Bainbridge St. on the morning of 5-15-75. This statement is given to Det. L.G. Rutland.
 "Last Sunday night or early Monday morning me and my brother-in-law got into a fight about him getting on to my sister about the way that she ran the house. I took up for my sister and I told him that he didn't have any reason to be telling my sister how to run the house for that he never did bring any money in. And if he had any money that he was spending it on the women that called him at the house on the phone. All this time that we were arguing we were in my sister's bedroom. This is the back bedroom. At this time he kicked me between my legs and I hit him on the jaw. After I hit him he then grabbed me and at this time I ran my two fingers under his neck and started putting pressure on his neck. At this time my sister ran in between us and broke us up. He then picked up a pair of high stack shoes and told my sister to move. I then told him to stop all the bad talk and do what he said he was going to do. My sister then started begging us to quit and at this time he put the shoes down and ran down the steps. When he ran down the steps my sister told me to watch it and for me to go in the bathroom. At this time I went into the bathroom and closed the door. I was in the bathroom running water in the tub and he ran back upstairs and kicked the door open. He then told me to come out of the bathroom and that he was going to bust me in the head. I told him that he was the one that had the hammer for him to come and get me. My sister then got to begging us to quit and he then said that it was all over. But he said the next time we had trouble that he was going to have his shit ready. I then told him that I had mine downstairs and that I didn't have it loaded at this time but I was going to load it. I also told him that I didn't buy it to hurt anybody with but if I had to use it I would. After I got through taking my bath I went downstairs and got my pistol out of the closet and loaded the pistol and put it back in the closet. I then put my clothes on and cooked breakfast and then went down to the city lot and got ready to go to work.
 "Q. Did you and him Leonard have any more trouble after the trouble Sunday night?
"A. No we didn't, not until tonight.
"Q. How long have you been staying at the house?
"A. About six months.
"Q. Was Leonard living there when you moved in?
"A. Yes.
"Q. Where was you tonight when the trouble started?
 "A. I was lying down on the blanket on the floor where I always sleep.
"Q. What started the trouble tonight?
 "A. I was lying on the floor and he came in and asked me if I had found me a place to go. I then told him that I had talked to my sister and she told me that she was paying the rent and that the house was in her name and that I didn't have to go anywhere. He (Leonard) then told me that I had to go somewhere and at this time he called my sister and at this he hit me on the jaw with his fist. And when he did this I rolled over and started shooting.
"Q. How many times did you shoot at him?
 "A. I shot at him five times. He made his move and I made my decision.
 "Q. Was there anyone else in the house at the time that you shot Leonard?
"A. No just me and him.
"Q. What did you do after you shot him?
 "A. I took the emptys out of the gun and reloaded the gun and was fixing to do it all over again and my sister came in and got in the way. I then walked out on the porch and I had to think a few minutes what I was going to do. I told myself that I was a man and I had to act like a man. I then walked toward the street and had gotten to the side of the street when the police pulled up and I *Page 1230 
turned the gun around with the butt of the gun toward the police officer and gave him the gun and told him that I was the one that had did the shooting.
 "This is a true statement and I willingly agreed to give the statement after being advised of my rights.
 "/s/ Arthur James Hurst
"Arthur Hurst 438 N. Bainbridge St.
 /s/ L.G. Rutland
Det. L.G. Rutland"
Richard A. Roper testified that he was employed by the State of Alabama, Department of Toxicology and Criminal Investigation. Counsel stipulated to Roper's qualifications.
Roper testified that he conducted a postmortem examination of the body of Leonard Harris. Roper observed five gunshot wounds; two passing through the right upper arm, one in the right chest, one in the left upper chest, and one in the side of the right thigh. The wound which entered the right chest traveled through the body cavity, through the right lung, heart, left lung, and lodged in the left armpit. Roper recovered this bullet. It was this wound, Roper testified, that caused Harris' death. He further testified that the angle of the wounds indicated that the deceased and his assailant were on the same level facing one another.
W.T. Sheriff was recalled and testified that the appellant handed him a pistol at the scene of the shooting. He identified a pistol exhibited at trial as the one he received from appellant. Sheriff turned this weapon over to Detective Norton when he arrived at the scene. Sheriff testified that appellant was not "delirious" or "uncontrollable" at that time.
H.C. Norton testified that he was a detective with the Montgomery Police Department and that he investigated a homicide on May 15, 1975, with Detective Rutland. Norton identified the weapon which Sheriff had identified and stated that he received it from Sheriff. Norton stated that he gave the weapon to Detective Coy Smith. He also recovered clothing worn by the deceased which he gave to Smith, and also three spent hulls and a small piece of lead. Norton stated that appellant was acting "normal" on May 15, 1975, and that he appeared to be neither calm nor excited.
Coy Smith testified that he was a detective with the Montgomery Police Department. He further testified that he took the evidence, given to him by Norton and Rutland, to the toxicologist's office. He gave that evidence to Charles Smith.
Charles Smith testified that he was employed by the Alabama Department of Toxicology and Criminal Investigation. He stated that he received the above mentioned evidence from Coy Smith. Smith further testified that, after he made test firings from the pistol he had received, he formed the opinion that the cartridges recovered from the scene at 438 North Bainbridge were fired from the same revolver that he had tested. After examining the clothing of the deceased, Smith concluded that the fatal shots were fired from a distance of less than six feet away.
At this time the State rested its case. Appellant moved for a directed verdict as to murder in the first and second degrees on the grounds that the evidence was insufficient to support a conviction of murder in any degree. This motion was denied.
Mrs. Beatrice Vickers testified on behalf of the appellant. She stated that she was his oldest sister and that she lived in Montgomery. Appellant had been in a mental institution in Spring Valley, New York, at one time and had returned to Montgomery where he remained until "he lost his mind again." Mrs. Vickers then had appellant "sent to Bryce." After appellant was released from that commitment, he was staying at the Rehabilitation Center in Montgomery. Mrs. Vickers testified that he "still wasn't in his right good mind." When appellant moved in with his sister Bertha McClain, he was "talking random," Mrs. Vickers stated. Appellant's mind "rambled." From the record:
 "Q. Tell me a for instance when you heard him act like that. *Page 1231 
 "A. Well, the first time when my brother — when I see my brother act off, he was walking around with his head tied up with a big white rag and a stick in his hand, walking around, talking about preaching and just a whole lot — just preaching and going on."
Mrs. Vickers further stated that appellant acted "real strange," and that he had never been normal even as a child. When they were children, their mother "used to make me go up under the house and get him out from under the house. He used to sleep up under the house, and I used to have to go and drag him out."
John Bradley Adams testified that he was Chief of Psychology and Clinical Coordinator for one of the large extended treatment units at Bryce Hospital in Tuscaloosa, Alabama. He stated that he had a Bachelor's Degree from the University of Florida, a Master's Degree from Emory University in Atlanta, Georgia, a Ph.D in Clinical Psychology from the University of Alabama, and that he completed a year's internship approved by the American Psychological Association at Bryce Hospital. He further testified that he had been employed at Bryce for thirteen years and had treated thousands of patients. Since 1965, Adams had concentrated his work with people with criminal charges against them or people from the penal system.
Adams testified that he treated and evaluated appellant at Bryce Hospital beginning December 15, 1975. Adams stated that appellant had been a resident at Bryce on two separate commitments: from September 7, 1973 to April 25, 1975 and from September 22, 1975 to January 16, 1975. Prior to his treatment of appellant, Adams stated that appellant was under supervision of the Forensic Program at Bryce.
Adams further stated that appellant was returned to stand trial on January 16, 1976. This resulted from a treatment planning conference held on January 8, 1976. At that time, Adams testified, appellant was able to understand the nature of the charges against him and assist his counsel in preparing a defense.
An evaluation of appellant's sanity was made at that time. From the record:
 "A. That he continued to be mentally ill. We changed the diagnosis on that day to one that we considered more descriptive of his condition at that time than the one that was appended at the time he was admitted in September.
 "Q. And what was that description, mental description?
"A. The second one?
"Q. Yes.
 "A. The diagnosis was schizophrenia, schizoaffective type, excited. This is descriptive of an individual who is psychotic, who has broken with reality as the rest of us perceive and interact with reality, who lives in a more or less fantasy world within their own mind."
* * * * * *
Further,
 "It's a thinking disorder. It means his thoughts are not connected with one another the way the rest of us do, that perhaps words mean different things to him than they do to us. It is an emotional disorder. His mood is markedly affected with this, which is what the schizo-affective describes. It's a major mood disorder with periods of deep depression and withdrawal, not talking, not doing anything, but a person who is primarily motivated or whose behaviors are determined by their feelings at the time."
Adams testified that in addition to his two admissions to Bryce, appellant had also been committed to Rockland State Hospital on two occasions. Considering his past history, his own conversations with and testing of appellant, Adams formed an opinion of appellant's competency at the time of the commission of the crime. Adams testified that appellant was not competent at that time. Appellant, in Adams' opinion, was not in a "lucid interval" at the time the crime was committed. He stated that such a lucid interval was conceivable, but highly unlikely.
On cross-examination of Adams by the District Attorney Adams testified that the *Page 1232 
mental disorder that appellant suffered from was a mental disease. From the record:
 "Q. Isn't this a mental illness somewhat of an emotional disorder or mood disorder that he is going through?
 "A. He has — his moods are affected, yes. His is primarily a thought disorder.
"Q. Is that a mental disease?
"A. Yes.
"Q. And how do you classify that as a mental disease?
 "A. I don't. I'm forced to adhere to the diagnostic and statistical manual of the International Association of Psychiatry, or something. They refer to it as a disease.
 "Q. And as a psychologist, you cannot testify as to whether or not it is a mental disease, can you?
"A. Yes, I'm qualified to evaluate and diagnose that.
"Q. As a mental disease?
"A. Well, that's your term. I wouldn't call it that.
 "Q. Well, it's a legal term that we're faced with today, Dr.
"A. Well, yes, I do this quite frequently.
 "Q. Since we're faced with it, then you can't. I understand.
"A. I have testified to it quite frequently, yes.
"Q. And how serious is his mental disease?
"A. Very.
"Q. Very serious?
"A. Yes.
 "Q. On a scale of one to ten, how serious would you say his mental disease is?
"A. Nine.
"Q. Nine?
"A. Yes.
 "Q. But he could sit here today and talk with his lawyer, Mr. Memory, and adequately help him prepare with his defense, and he can also understand the circumstances and the charges and the events that are going on here today?
"A. Yes.
"Q. Even on a nine out of ten?
"A. Um hum."
Adams again testified that appellant could have had a lucid interval on May 15, 1975. However, he again stated that this was extremely unlikely.
On redirect examination, Adams testified on May 14, and 15, 1975, appellant suffered from a diseased mind.
Appellant then testified in his defense. He testified that he was in a mental institution in New York on two occasions some time in the sixties. He remained there until he got ready to come home. When he returned to Montgomery, appellant lived with his girl friend. He then went to Bryce Hospital in 1972, where he remained for six or seven months.
Appellant stated that when he was released from Bryce and returned to Montgomery he lived in the Rehabilitation Center rather than live with relatives.
From the record:
"Q. Why was that?
 "A. Because I wanted peace, because my relatives would give me hell, and I want peace. I die and go to hell for my rights. They can't take my rights from me."
Appellant testified that he worked for Montgomery Roofing Company three or four months and then worked for the Coca Cola plant for five and a half months. He left that job because "me and the foreman couldn't get along and everybody was trying to tell me hurt the foreman, the old man, and I ain't going to nothing like that."
Then appellant worked for the City. He lived at his sister's, Bertha McClain's, house and in a house owned by the Rehabilitation Center. Appellant worked as a garbage collector.
Appellant stated that while he stayed at Bertha's he slept on a pallet on the floor. Appellant began to have trouble with Leonard Harris four to six months after he had moved in at Bertha's.
From the record:
 "Q. And on that Sunday or Monday early in the morning, what happened between you and Leonard, if anything? *Page 1233 
 "A. Well, one Sunday night or Monday night, whatever you want to call it, before Monday morning, Leonard woke me up by fussing with my sister about some kind — I don't know. They were arguing about — I tried to break the argument up before coming to a fight, trying to get —
"Q. Slow down, so we can all —
 "A. I tried to give him back what the judge would have gave him. And when I opened my mouth and gave my tenure what the judge had said, that he wasn't doing nothing at the house, and why should he tell Bertha how to run the house. If he don't like the way she run it, that's her house. She run it like she wanted to run it, and that was my opinion. I gave him the same thing to keep me out of the truck. And I guess he done crusaded that back. He asked me who in the hell I was, nigger. So when he kicked me in my private, I tried to kick him right then; and that's then. That's where his right right there, and I put my two fingers — after I flung and hit him, I put two fingers there, where the shock, and pressed on it; and Bertha broke that hold up.
"Q. She broke you up?
"A. Right.
 "Q. And you went up there originally to break up the fight between — what appeared to be between your sister and ___
"A. Right.
"Q. And then what happened?
"A. Then he told me the next time ___
"Q. I want you to slow down and speak clearly.
 "A. Then he said, `Nigger, I want you to have your shit ready.'
"Q. Did he threaten to kill you?
"A. Yes, he did.
"Q. And what did he do next, if you know?
 "A. He picked up a pair of high stack shoes, after she broke us a loose.
"Q. Okay. And then what after she had broken you up?
"A. Right. Then he ran downstairs to get a hammer.
"Q. A hammer?
"A. Right.
 "Q. And what did he do? — Where did you go while he was downstairs?
"A. Well, I was in the bathroom.
"Q. Why did you go in the bathroom?
"A. Because my sister told me to go in the bathroom.
"Q. She told you to go to the bathroom?
"A. Right.
"A. And that's what you did?
 "A. That's what I did. And I closed the door, and he came and kicked the door open; and I turned around like this. And when I turned around like this, he jumped me and told me to come in the hall and said he was going to bust my living head open with the hammer. I told him he was the man with the hammer, to come in and get me. `I ain't got nothing but man to man.' So he picked the weapon up, and I told him, `I done told you about picking up the weapon.' He didn't tell me a thing right then, but next time, `Have your shit.'
 "Q. He said he wasn't going to hurt you then, but the next time?
"A. Right, `to have my shit.'
"Q. Okay. Did you fight anymore that night?
"A. No, we didn't."
Appellant stated that the shooting occurred the next Wednesday night. From the record:
"Q. You went to bed?
"A. Yes.
"Q. Did you go to sleep?
"A. I went to sleep.
"Q. And then what was the next thing you remember?
 "A. The next thing I remember, Leonard Harris come in kicking on me and had a hammer in his hand; and when he raised the hammer up, I rolled up and let him have what I had waiting.
"Q. Is that when you shot him?
 "A. That's when I shot him, was with a .38, under the pillow.
"Q. Your .38 was under the pillow?
"A. Right. *Page 1234 
 "Q. But he came — and you were asleep when he kicked you and hit you?
"A. Right.
"Q. What did he tell you?
"A. He told me, `You ain't got out yet?'
"Q. He told you, `Haven't you got out yet?'
"A. Right.
 "Q. And that was when he started hitting you and kicking you?
"A. Right.
"Q. And that was when you shot him?
"A. Right.
"Q. What was the next thing you did?
"A. I emptied the gun in him.
"Q. You what?
"A. I emptied the gun in him.
"Q. Okay. And what were you going to do?
 "A. Reload it and start over. That much hell he had in him, that's how much hell I had in me.
"Q. And then what stopped you?
"A. Bertha.
"Q. Bertha?
"A. Yes.
 "Q. And after she stopped you and went and called, what did you do?
 "A. Well, I walked out the door. And at that time I hoping the police would come out there.
"Q. You were hoping the police would come?
 "A. Yes. They took them too long to come, and I got ticked off with them; and they hadn't showed up, and I got ticked off. Something told me to be patient, they will be here.
"Q. Something told you to be patient?
 "A. Yes. And I walked — something told me, `go out there to the curb. They are out there.' By the time I got to the curb, I seen the car coming down; and that's when I gave them the gun.
"Q. Gave him the gun?
"A. Yes."
Appellant stated that if he was pushed a little bit he was ready to "show them where the power is." When the deceased "made his move," appellant made the decision, "give me hell or jail."
From the record:
 "Q. And did it make you feel like a man when you shot him?
 "A. Did it make me feel like a man? I was stupid. Idiot.
"Q. Idiot, stupid?
"A. Right.
"Q. Why?
 "A. Fighting also. I found fighting real stupid. Killing was stupid.
"Q. Stupid?
"A. Right.
"Q. Is it wrong?
"A. I wouldn't say it was wrong.
"Q. You don't think it's wrong to kill?
 "A. I don't think so. Sometimes you have to prove a point to a person some kind of way."
Subsequently the appellant testified that he knew it was wrong to kill another man but he had no choice. Appellant stated that he was now "fighting his case," because his white brother and sister wanted him alive. Appellant stated that he didn't mess around with normal folk. He said that he got understanding from people with mental problems.
Appellant contends that his statement given to police was involuntarily made and should not have been submitted to the jury.
In general an extrajudicial confession, oral or written, is prima facie involuntary and inadmissible. The duty rests in the trial judge in the first instance to determine whether the confession is voluntary, and, unless it so appears it should not be admitted. Pike v. State, Ala.Cr.App., 340 So.2d 865;Hardin v. State, Ala.Cr.App., 344 So.2d 234. Where the trial judge finds that a confession is voluntary, in a hearing outside the presence of the jury, that finding will not be disturbed unless contrary to the great weight of the evidence and manifestly wrong. Balentine v. State, Ala.Cr.App.,339 So.2d 1063.
We hold that appellant's confession was properly submitted to the jury in this case. *Page 1235 
The Supreme Court of Alabama, through Simpson, J., stated inGoldin v. State, 271 Ala. 678, 127 So.2d 375, that:
 ". . . The fact that an accused is not in full possession of his or her mental faculties when the confession is made does not render it inadmissible, but only affects the weight to be accorded by the jury; or is provable merely to support other evidence that the confession was not voluntary. To render such a confession inadmissible on that ground the mania must have been such that the accused was either an idiot or a lunatic during lunacy. Redwine v. State, 258 Ala. 196, 61 So.2d 724."
Also in Elrod v. State, 281 Ala. 331, 202 So.2d 539, the Supreme Court of Alabama, through Merrill, J., stated the proposition as follows:
 ". . . Accused's intelligence, character and situation at the time of the confession of the crime charged are important considerations in determining whether the confession was voluntary, but the fact that accused was of tender age or weak intellect will not alone render the confession inadmissible in evidence as involuntary. State v. Ashdown, 5 Utah 2d 59, 296 P.2d 726, affirmed 357 U.S. 426, 78 S.Ct. 1354, 2 L.Ed.2d 1443. Evidence tending to show a defendant's weak mentality, feeblemindedness, and mental stress does not affect the admissibility of the confessions, but rather is a matter that bears on the weight, credibility and effect to be given the confessions by the jury. State v. Stewart, 238 La. 1036, 117 So.2d 583.
* * * * * *
 "We have said that a `person may be partially insane and still be competent to testify or make a confession.' The (sic) involves an inquiry into his appearance, demeanor and the nature of his statements. It is for the court to determine whether he has or had the requisite intelligence and ability to communicate his responses to questions. Redwine v. State, 258 Ala. 196, 61 So.2d 724. . . ."
Appellant relies solely on Blackburn v. Alabama,361 U.S. 199, 80 S.Ct. 274, 4 L.Ed.2d 242. In Blackburn the evidence indisputably established the strongest probability that he was insane at the time he gave a confession. Additionally, law enforcement officers interrogated defendant for eight or nine hours. We cannot say here that there existed that strongest probability of appellant's insanity at the time the statement was given. Indeed, Adams testified that the statement could have been given in a lucid moment, although it was highly unlikely. Also, the appellant's statement was given only twenty or thirty minutes from the time officers arrived on the scene. Under the evidence in this case it cannot be said that the trial judge was manifestly wrong.
Appellant contends that the trial court erroneously limited his examination of John Bradley Adams, Ph.D.
From the record:
 "Q. Dr. Adams, I assume that you — I realize that you cannot testify concerning anything other than your treatment, but have you looked or considered his past history?
"A. Oh, yes.
 "Q. And what does that reveal as far as his mental illness is concerned?
"A. A lengthy period covering five years or so.
 "MR. POOL: Judge, I'm going to object at this time. I'm not trying to hide what happened before this, but I believe the law allows this doctor to testify as to his conclusions. And in basing his conclusion, he can draw upon the man's past record.
 "THE COURT: Yes, I agree with you on that, because this other party wouldn't be here for cross-examination.
 "MR. POOL: That's true, Judge. He can draw upon it, but he can't testify as to what the past record is.
 "THE COURT: I'm going to sustain your objection on that.
"MR. POOL: Thank you, Judge." *Page 1236 
Here there was no error. Appellant was attempting to elicit the opinion of Adams as to appellant's mental state at the time of the commission of the offense based, in part, on the medical records from Bryce Hospital.
Analogous to the question at hand are those cases which hold that physicians cannot testify to information concerning the condition of their patients. See McElroy, Law of Evidence In Alabama, Second Edition, Sec. 110.01 (3), which states:
 "A physician-witness' testimony to his opinion with respect to the condition of his patient may not be supported by testimony by such witness that certain opinions or reports (including reports of radiologists) concerning the patient had been made to him by other physicians; or that in inferences between him and other physicians associated in the treatment of the patient, they expressed and concurred in a certain opinion with respect to the patient's condition, citing Clark v. Hudson, 265 Ala. 630, 93 So.2d 138; Prince v. Lowe, 263 Ala. 410, 82 So.2d 606; and Hussey v. State, 87 Ala. 121, 6 So. 420."
Additionally, witnesses, including medical witnesses, cannot testify to facts of which their knowledge is derived from the unsworn statements of others. Cordle v. State, 53 Ala. App. 148,298 So.2d 77, cert. denied 292 Ala. 717, 298 So.2d 85.
These records were properly admitted, however, under the Business Records Act, Alabama Code 1940, Title 7, Section 415.
Appellant, in a related contention, also argues that the trial court committed reversible error.
From the record:
 "Q. Could Mr. Hurst determine the difference between right and wrong at that time?
 "MR. POOL: Judge, I would object to that. That's an ultimate decision to be made by the jury.
 "THE COURT: Yes, I'm going to sustain the objection. You must first show there is a disease of the mind, Mr. Memory, that he bases this on, under the law.
"MR. MEMORY: I'm going to get to that, Judge."
The trial judge was correct in this ruling. See Wingard v.State, 247 Ala. 488, 25 So.2d 170; Hafley v. State,342 So.2d 408; and Breen v. State, 53 Ala. App. 588, 302 So.2d 562.
Appellant argues that he was deprived of a fair and impartial trial because of the District Attorney's remarks made during the opening statement, and closing argument.
From the record:
"OPENING STATEMENT BY MR. POOL
 "— But the only thing exciting about the murder is the thrill, the sheer joy, and the blood curdling excitement ___
 "MR. MEMORY: Now Your Honor, I object, and I think he's gone way beyond the bounds. When I got into this point —
 "THE COURT: You almost made an opening argument, and I didn't call you down until the very last. Overrule your objection."
Further:
 " MR. POOL — This man slaughtered him, this man slaughtered him ___
 "MR. MEMORY: I object to those characterizations. I don't believe that slaughter and all of that should ___
 "THE COURT: Well, he was just using that as an illustration. Overruled.
 "MR. MEMORY: If I may, note my objection and give me exception.
"THE COURT: Go ahead."
There is no legal standard by which the prejudicial qualities of improper remarks of the District Attorney in a trial of a case can be judged, each case must be determined on its own merits. Binion v. State, Ala.Cr.App., 327 So.2d 729. Counsel for both the state and the defendant are allowed a wide latitude in drawing their deductions from evidence in argument to the jury. Summers v. State, Ala.Cr.App., 348 So.2d 1126. *Page 1237 
Here we do not think that the District Attorney overstepped the bounds of fairness and impartiality.
Appellant argues that the trial court erroneously omitted from the oral charge an instruction that a person who is attacked in his own home does not have a duty to retreat. At the end of the Court's oral charge to the jury, counsel stated that he had several matters which he wished to take up outside the presence of the jury. When the jury retired, counsel made several exceptions to the Court's oral charge, including the above alleged error. The trial judge stated that it was counsel's duty to prepare written instructions to that effect, which counsel had not done.
Here, there was no error for two reasons.
First, the trial judge was correct in his statement to counsel that written requested charges should have been submitted. Cooper v. State, Ala.Cr.App., 331 So.2d 752.
Secondly, exceptions to the oral charge or any part of it, to be availing, must be taken and reserved in the presence of the jury and before the jury retires. Hafley v. State, Ala.Cr.App.,342 So.2d 408; Lowery v. State, Ala.Cr.App., 342 So.2d 797.
Finally appellant urges that his conviction is unsupported by the evidence in the case. In particular he contends that the evidence of insanity at the time of the shooting is overwhelming. He stresses the testimony of Mrs. Vickers, Adams, and appellant's medical records from Bryce Hospital.
Where there is legal evidence from which the jury can by fair inference find the defendant guilty, the Court of Criminal Appeals has no right to disturb the verdict. Whether there is such evidence is a question of law, with the weight and probative value for the jury. Woods v. State, Ala.Cr.App.,344 So.2d 1225; Williams v. State, Ala.Cr.App., 348 So.2d 1142.
The question of insanity at the time of the commission of a crime is a matter to be determined by the jury from consideration of all the evidence. Carr v. State, 43 Ala. App. 642, 198 So.2d 791. In making this determination, the jury may reject all expert testimony though it is without conflict.Hockenberry v. State, 246 Ala. 369, 20 So.2d 533.
We are conscious of the principle that, "cases of insanity may be so clear, that the jury should be instructed in like form." Boyle v. State, 229 Ala. 212, 154 So. 575; cited inChristian v. State, Ala.Cr.App., 351 So.2d 623. However, it does not appear that this is the case here.
In Christian, supra, the Supreme Court pointed out the following:
 "To sustain the burden of the issue of insanity raised by his plea, the appellant introduced testimony of three psychiatrists, each of whom testified that Christian was insane at the time he committed the homicide. The record also shows Christian had a history of mental disorders and had been admitted to Bryce Hospital on several occasions prior to the homicide. Members of Christian's immediate family testified to the following unusual behavior of their brother prior to the homicide: talking to a television set; imagining that every radio and television set contained a microphone to spy on him; imagining that red and blue subversives were out to get him through the use of their control over all the birds; believing that he was Jesus and possessed by the devil; believing that he saw winged monsters; and pretending he was talking to deceased relatives.
 "One of the police officers, who finger-printed Christian after his arrest, testified that later the same night Christian made other unusual statements such as, `It is in the stars,' `I can see it in the stars,' `I can see it in the future,' `It is in my eyes.'
 "The State presented no expert testimony concerning Christian's sanity, but points to the testimony of Miss Joyce Williams, Christian's sister, on this issue. Her testimony in part was that in 1972 a Bryce Hospital case worker told her and her mother that Christian was in good condition *Page 1238 
and that if he would take the medication prescribed for him he could live among normal people. Miss Williams also stated that her mother told her on one occasion that Christian had said he would kill her if she tried to put him back in Bryce Hospital. No objection was made to the introduction of this testimony."
Appellant's records from Bryce Hospital were admitted into evidence as a defense exhibit. Nothing in those records unequivocally states that he was impaired by a mental disorder at the time Leonard Harris was killed. Only a progress report made by medical resident Ochoa, level 1-A psychiatrist, addresses the matter of sanity at the time of the offense. That report, written on December 16, 1975 states that there was a "strong indication" that an affective disorder "determined or allowed the behavior which brought on his court charges."
At trial, Adams was not able to state unequivocally that appellant was not in a lucid state at the time of the shooting.
Mrs. Vickers stated that her brother, the appellant, was not "normal" from childhood.
Such evidence does not constitute a case of insanity "so strong and undisputed," that the jury could not have found that appellant was sane at the time of the commission of the crime.
In Parrish v. State, 139 Ala. 16, 36 So. 1012, it was said: "The question as to the competency of the witness, whether expert or not, to give an opinion as to the sanity or insanity of the party inquired of, is a question for the court, and not for the jury."
The testimony of the psychologist was much more confusing than enlightening and certainly failed to meet the test of insanity laid down in the celebrated case of Parsons v. State,81 Ala. 577, 2 So. 854.
As to the qualifications of a non-medical psychologist to testify as to mental condition or competency of an accused see the annotation in 78 A.L.R.2d at page 919.
We find the record free of error and the judgment of conviction is affirmed.
AFFIRMED.
All the Judges concur.