## ASHDOWN *v.* UTAH.

No. 158.   Argued April 1, 1958.—Decided June 30, 1958.

*J. Vernon Erickson,* acting under appointment by the Court, 355 U. S. 853, argued the cause and filed a brief for petitioner.

*Walter L. Budge,* Deputy Attorney General of Utah, argued the cause for respondent.   With him on the brief was *E. R. Callister,* Attorney General.

Mr. Justice Burton delivered the opinion of the Court.

A jury in a Utah court found petitioner, Mrs. Ashdown, guilty of the first-degree murder of her husband and recommended a life sentence. The question before us is whether petitioner's oral confession was obtained in such a manner as to make its use in evidence a violation of the due process of law required by the Fourteenth Amendment to the Constitution of the United States. This issue was thoroughly considered by the trial court which made findings in relation to it. The Supreme Court of Utah reviewed the record in detail and upheld the admission of the confession. 5 Utah 2d 59, 296 P. 2d 726. We granted certiorari. 353 U. S. 981. Our independent review of the record brings us to the same conclusion.

On July 5, 1955, Ray Ashdown, petitioner's husband, died suddenly in his home in Cedar City, Utah. Petitioner had summoned a doctor who arrived shortly before Ray Ashdown's death. The doctor testified that the deceased gave the appearance of having been poisoned and that he told the doctor just before he died that he had taken some bitter-tasting lemon juice about a half hour earlier. On being called, the sheriff made a thorough search of the Ashdown home but found no trace of any poison. An autopsy was performed, and the contents of the deceased's stomach was sent to the state chemist's office for analysis. The report, received by the sheriff on July 9, stated that the stomach of the deceased contained strychnine.

July 9 was the day of the funeral. Promptly after receipt of the chemist's report, the sheriff went to the cemetery, arriving just after the interment. Through petitioner's brother-in-law, the sheriff asked that petitioner come to the County and City Building. At about 4 p. m. she and her sister arrived at the sheriff's office.

The sheriff asked to talk with petitioner privately and she consented. They went across the hall to an empty courtroom where the sheriff, a deputy sheriff and the district attorney, all people known by the petitioner, talked with her for the next five and one-half hours.

The sheriff told petitioner the results of the autopsy and the chemist's report. Within the first half hour, the district attorney advised her that she did not have to answer any questions and that she was entitled to consult with an attorney. She made no request for an attorney at that time. She said she did not think she could add anything to help the investigation, but she mentioned her husband had been despondent on several occasions. The officers let her talk freely on family matters without interruption and such conversation consumed about half the time spent in the interview. The sheriff attempted to direct her attention to discovering whether her husband's death might have been due to an accident. To impress her with the importance of the distinction between murder and manslaughter, the district attorney read her some of the statutes relating to those crimes. In addition, he told her about an experience he had in the Army in Europe. He said he had been accused of killing five men but, by cooperating with investigating officials, he had been cleared of all blame for those deaths.

The officers reviewed in detail the events of July 5. Petitioner admitted giving her husband a cup of lemon juice about a half hour before his death. She said she had put salt in the juice and denied that she might have mistakenly used poison instead of salt. The sheriff asked whether the deceased drank all of the lemon juice offered him. Petitioner replied that he had not, and that she had thrown out the remainder and put the cup, unwashed, on top of the Frigidaire. In their search of the house, the officers found the cup, washed, standing on the drain-

board.   When asked about it, petitioner said that, after she had gone for the second time to a neighbor's house to call the doctor (who arrived before she returned), she had washed the cup and placed it where the officers found it. Petitioner could not explain why she had walked past the doctor and her husband, who was at that moment in the last extremity, to wash a cup.   Petitioner several times asked whether the officers wanted her to confess to something she had not done, and they repeatedly told her they did not.

Petitioner, at one point, stated that her husband had put the strychnine in the lemon juice.   After a brief interrogation as to how he had done it, the sheriff told her he did not believe her husband had poisoned himself. Petitioner then confessed that she had put five or six grains of strychnine in the cup.   She said she had planned to take it herself but later decided to give it to her husband.   The sheriff testified that she was emotionally upset, crying and sobbing.   The confession came about four and one-half hours after the questioning began.   Petitioner hesitated to say where she had obtained the strychnine and suggested she should have an attorney.   The sheriff did not respond to this request. He said merely that she had told them everything except where the poison came from, and she might as well tell that "and get this over with."   She then told where she had obtained the strychnine.

Meanwhile, petitioner's father and uncle had come to the County and City Building.   They asked to see petitioner and their request was denied, pending completion of the interview.   They waited in the sheriff's office and, at his request, made several trips to the Ashdown home. From their position in the hall outside the courtroom, they heard petitioner crying and sobbing.   After petitioner had confessed, the sheriff asked her whether she

wanted to see her relatives. At first she refused, saying she was ashamed to face them, but the sheriff persisted and she eventually consented.

On the 10th, the sheriff prepared a written statement of what petitioner had said the day before and took it to her cell. She was told she could sign the statement or not as she wished, and she could make changes. She examined the statement carefully, made numerous changes, and signed it.

At the trial, the court held an extended hearing in the absence of the jury on the admissibility of petitioner's confessions. Petitioner took the stand during the preliminary hearing but testified only as to what the district attorney had said. She did not challenge any other statements of the sheriff, the deputy sheriff or the district attorney. The trial court ruled that all statements made by petitioner after her request for an attorney, including the written statement, should be excluded. Thus, only the oral confession was introduced in evidence before the jury.

Petitioner emphasizes the statement of the district attorney that he had once avoided a criminal charge by cooperating with the investigating officers. Petitioner argues that this statement was an implied promise of immunity or leniency to be exercised in return for a confession. We agree with the Supreme Court of Utah that, under the circumstances, this statement was not improper. It was made long before petitioner confessed and in connection with the search for an accidental explanation of the death. Moreover, petitioner was repeatedly told not to confess to something she had not done.

A study of the record as a whole convinces us that the interview with petitioner was temperate and courteous. The sheriff proceeded cautiously and acted with consideration for the feelings of petitioner. For example, he explained that the reason he did not seek a written state-

ment until the day after the interview was that "We thought we would talk to her on the 10th, she would be calm and wouldn't be excited and she would know what she was doing. We didn't want to feel like taking advantage of her." Petitioner's emotional distress during the interview may be attributed to her remorse, rather than to any coercive conduct of the officers. There is nothing in the record which indicates that the sheriff chose to question petitioner immediately after her husband's funeral in order to capitalize on her feelings. Rather, he appears to have taken the first opportunity to talk with her after it had been established that her husband's death was caused by poisoning. The questioning was done by officers whom petitioner knew. She was not questioned in relays or made to repeat a story over and over while the interrogators searched for an inconsistency or flaw. She was allowed to talk without interruption about such matters as she chose. In sum, we find ample support in this record for a finding that the officers did not intend to take advantage of petitioner and that nothing they did had the effect of overbearing her will.

Accordingly, the judgment is

*Affirmed.*

Mr. Justice Douglas, with whom Mr. Justice Black concurs, dissenting.

The uncle and the father of petitioner appeared at the sheriff's office shortly after petitioner was arrested. The uncle testified that he said, "I don't think she has got a right to be questioned without her father's presence or some attorney." The father testified that he said, "I made the remark that it didn't look to me like a fair, square deal, to railroad that girl into that sheriff's office without counsel or friends of any description."

The uncle and the father were denied admission. They were calmed by the assurance that the accused had a

lawyer at her side to aid her under the questioning of the police—which was not true.

The request of a next of kin or friend outside the jail that counsel be furnished the accused who was inside under examination should be demand enough. Certainly those on the outside would have calmer judgment than the accused. They should speak for her unless it is clear, as it was not in this case, that the accused had waived her right to a lawyer and had elected to talk instead. For the reasons stated in my dissent in *Crooker* v. *California, post,* p. 441, decided this day, I would reverse this judgment of conviction.