2008 UT App 285

**STATE of Utah, Plaintiff and Appellee,**

v.

**Edgar Jose MONTERO, Defendant and Appellant.**

**No. 20060859–CA.**

Court of Appeals of Utah.

July 25, 2008.

Linda M. Jones, Kimberly A. Clark, and Ralph W. Dellapiana, Salt Lake City, for Appellant.

Mark L. Shurtleff, atty. gen., and Marian Decker, asst. atty. gen., Salt Lake City, for Appellee.

Before Judges BENCH, BILLINGS, and ORME.

## OPINION

ORME, Judge:

¶1 Defendant Edgar Jose Montero appeals from his conviction, following a jury trial, for murder, aggravated assault, and possession or purchase of a dangerous weapon. He argues that the trial court erred in failing to suppress his confession, which he contends police obtained through coercion and improper interrogation tactics. We affirm.

## BACKGROUND [1]

¶2 In the early morning hours of March 19, 2005, Montero and a number of his acquaintances—some of them gang members—gathered at Perry and Eugene Spight's apartment in Taylorsville for a party. Among the group were Jose Johnson, Lonia Kersey, Marci Batchelor, and Heron Gonzales. At some point, Montero and Gonzales began arguing over gang-related matters. Perry asked them to go outside, where the argument continued, and Johnson, too, began arguing with Gonzales. Eventually, Batchelor and the Spight brothers went outside to try to diffuse the situation. Shots were fired, and Perry Spight was struck in the back, fatally wounded.

¶3 The party guests scattered. Eugene Spight later testified that he saw Montero get into Johnson's red SUV. Batchelor testified that she and Gonzales left together and met up with some friends at a restaurant. She further testified that while she was at the restaurant, Montero called her on her cell phone and asked, "Did I get him?"

¶4 Meanwhile, police began to investigate. Their investigation led them to Johnson's house, where they found Johnson, Montero, and Kersey. When they knocked on the front door, Montero "almost immediately" attempted to escape out the back basement door. He was apprehended, and police took all three to the police station for questioning. Pursuant to a search warrant issued shortly thereafter, police searched Johnson's home. In the basement bedroom from which Montero had attempted to flee, they found a black parka in which was found a .25 caliber semiautomatic pistol. Ballistics testing later showed that the fatal bullet and two shell casings found at the scene came from that pistol.

¶5 At the police station, Johnson refused to cooperate and was taken to jail on obstruction of justice charges. Montero waived his *Miranda* rights and agreed to talk to Detective Adamson. Over the course of the next six and one-half hours, Detective Adamson conducted an on-again, off-again interrogation while Montero sat handcuffed to a chair in a small interrogation room. Near the end of the detention and after changing his story repeatedly, Montero admitted that he pulled the trigger on the gun that killed Perry Spight.[2]

¶6 Before trial, Montero moved to have his confession suppressed. The trial court denied his motion, and a videotape of his confession was admitted as evidence during his jury trial.[3] Eugene Spight and Batchelor also testified at trial. Eugene testified that he saw Montero, whom he identified as "Gumby," shoot Perry. Batchelor testified that she "looked up ... at [Montero]," who was wearing a "big, black jacket" and standing about twenty-five feet away holding a gun, with "his arms ... extended ... like he was pointing it." The jury convicted Montero, and the trial court sentenced him to serve a term of up to life in the state prison. Montero appeals.

## ISSUE AND STANDARD OF REVIEW

¶7 On appeal, Montero renews his argument that his confession should have been suppressed. Specifically, he argues that his confession was involuntary, a result of Detective Adamson's coercive interrogation tactics, and that its admission as evidence was prejudicial to his case. "The constitutional standard for determining the voluntariness of a confession requires that we independently review the entire record," *State v. Mabe*, 864 P.2d 890, 892 (Utah 1993), applying bifurcated analysis, *see State v. Rettenberger*, 1999 UT 80, ¶10, 984 P.2d 1009. "We set aside a [trial] court's factual findings only if they are clearly erroneous." *Id.* "The ultimate determination of voluntariness [of a confession] is a legal question" that we review "for correctness." *Id.*

---

1. We state the facts in the light most favorable to the jury's verdict and the trial court's rulings. *See State v. Hobbs*, 2003 UT App 27, ¶2, 64 P.3d 1218, *cert. denied*, 72 P.3d 685 (Utah 2003).

2. Additional relevant facts are discussed later in this opinion, in the course of considering Montero's arguments on appeal.

3. Detective Adamson also summarized Montero's confession during his testimony at trial.

## ANALYSIS

¶ 8 The Fifth Amendment to the United States Constitution "protects individuals from being *compelled* to give evidence against themselves." *Id.* ¶ 11 (emphasis in original) (citations and internal quotation marks omitted). Under the Due Process Clause of the Fourteenth Amendment, "certain interrogation techniques, either in isolation or as applied to the unique characteristics of a particular suspect, are so offensive to a civilized system of justice that they must be condemned." *Id.* (citations and internal quotation marks omitted). " 'In the face of a [defendant's] challenge to the voluntariness of a statement or confession, it is incumbent upon the prosecution to demonstrate by a preponderance of the evidence that the statement was made voluntarily based upon the totality of circumstances.' " *Id.* ¶ 45 (quoting *State v. Allen,* 839 P.2d 291, 300 (Utah 1992)).

¶ 9 A confession is involuntary only where evidence shows " 'some physical or psychological force or manipulation that is designed to induce the accused to talk when he otherwise would not have done so.' " *Id.* ¶ 25 (citation and emphasis omitted). *See also Colorado v. Connelly,* 479 U.S. 157, 167, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986) ("[C]oercive police activity is a necessary predicate to the finding that a confession is not 'voluntary.' "). A finding of involuntariness also requires that there be " 'a causal relationship between the coercion and the subsequent confession.' " *Rettenberger,* 1999 UT 80, ¶ 18, 984 P.2d 1009 (citation omitted). "In other words, the evidence must show that the coercive tactics ... overcame the defendant's free will." *State v. Galli,* 967 P.2d 930, 936 (Utah 1998).

¶ 10 Factors relevant to our consideration of the evidence include "the duration of the interrogation, the persistence of the officers, police trickery, absence of family and counsel, and threats and promises made to the defendant by the officers." *Rettenberger,* 1999 UT 80, ¶ 14, 984 P.2d 1009. We "must also consider such factors as the defendant's mental health, mental deficiency, emotional instability, education, age, and familiarity with the judicial system." *Id.* ¶ 15.

¶ 11 Montero's counsel describes the coerciveness of his interrogation in these terms:

The interrogation took place over a period of more than six hours; [Detective] Adamson was persistent; he made threats, promises, and misrepresentations, and he used trickery; he used the false friend technique; he subjected Montero to extended periods of incommunicado; there is no indication that Montero had anything to eat, and [Detective] Adamson brushed aside Montero's requests to lie down, or to call his mother, and his concerns about throwing up.

These "coercive tactics," according to Montero, caused him to confess "just to end the interrogation." Moreover, he asserts, because "[c]onfession evidence can be powerful in a case that requires the jury to make inferences," its admission under the circumstances here had a "pervasive influence" and was unduly prejudicial. We address each of these arguments in turn.

¶ 12 Montero was interrogated off and on for just over six hours. Our review of the record, including the videotape of the interrogation, shows that Detective Adamson actively questioned Montero for less than half that time. Montero claims that this was excessive, but he provides no case law supporting that view. On the other hand, the State points us to cases where detentions and interrogations for similar periods of time were held to be acceptable. *See State v. Ashdown,* 5 Utah 2d 59, 296 P.2d 726, 729 (1956) (holding that five and one-half hour interrogation was not coercive), *aff'd,* 357 U.S. 426, 78 S.Ct. 1354, 2 L.Ed.2d 1443 (1958); *State v. Rousan,* 961 S.W.2d 831, 846 (Mo.1998) (holding that three and one-half hours of interrogation out of six hours of custody was not coercive). The duration of an interrogation has typically been viewed as coercive only when it is much longer than in the instant case. *See Ashcraft v. Tennessee,* 322 U.S. 143, 154, 64 S.Ct. 921, 88 L.Ed. 1192 (1944) (holding that virtually nonstop interrogation for thirty-six hours was coercive). *But see Commonwealth v. D'Amato,* 514 Pa. 471, 526 A.2d 300, 306 (1987) (holding that fifty hours of detention, without more, does not necessarily make a

confession involuntary). *See also* 2 Wayne R. LaFave et al., *Criminal Procedure* § 6.2(c), at 620–21 (3d ed.2007) (listing cases and commenting that "when the circumstances [of a detention and interrogation] are somewhat less extreme, . . . exclusion of the confession has typically occurred only when it was also shown that the defendant was especially susceptible to coercion"). Given all the circumstances and guided by this authority, we hold that the length of Montero's detention and interrogation was not coercive.

¶ 13 Montero also complains that Detective Adamson was persistent. For example, he complains that Detective Adamson "repeatedly maintained that statements and evidence pointed to Montero as the shooter." He further complains that Detective Adamson rejected his explanations as inconsistent with the information police obtained, and that Detective Adamson "urged [him] to 'be a man'" and suggested that he "needed to take responsibility" for his actions. But a police officer's exhortations to tell the truth or assertions that a suspect is lying do not automatically render a resulting confession involuntary. *See* 2 Wayne R. LaFave et al., *Criminal Procedure* § 6.2(c), at 636 (3d ed.2007). On the contrary, we think it eminently reasonable that police officers challenge criminal suspects' questionable explanations in their pursuit of the truth and their efforts to solve crimes. We do not think Detective Adamson was overzealous in his pursuit of the truth; in fact, he gave Montero every opportunity to explain his involvement. On one occasion, he remarked to Montero, "I'm going to give you every opportunity to you know . . . resolve this and if there's somebody else . . . we want somebody else . . . we definitely don't want the wrong guy . . . you know . . . because that means . . . somebody got away with murder." Given the absence of any evidence of "systematic persistence" sufficiently egregious to suggest coercion, *see, e.g., Harris v. South Carolina,* 338 U.S. 68, 71, 69 S.Ct. 1354, 93 L.Ed. 1815 (1949), we hold that Detective Adamson's approach, to the extent it constitutes "persistence" at all, was not coercive.

■ ¶ 14 Montero next contends that Detective Adamson "made threats, promises, and misrepresentations, and he used trickery." We find little support for this contention. "[A]n interrogation can be 'impermissibly coercive because [it] carried a threat of greater punishment or a promise for lesser punishment depending on whether [a defendant] confessed.'" *State v. Rettenberger,* 1999 UT 80, ¶ 29, 984 P.2d 1009 (second and third alterations in original) (quoting *State v. Strain,* 779 P.2d 221, 226 (Utah 1989)). Detective Adamson did not make any such threats or promises to Montero. Rather, Detective Adamson told Montero that he could "end up going to jail," and that he "could still be an accessory to a murder." These statements do not constitute threats that can realistically be said to have overborne Montero's will. And they were factually accurate statements.

¶ 15 Nor do Detective Adamson's suggestions that Montero's "cooperation is . . . the only thing that is going to save . . . [him] from getting into . . . any trouble," and that "maybe [he could] get in there . . . and cut some kind of a deal," constitute promises that provided improper inducements to Montero to confess. These, too, were accurate statements of fact. The possibility was open to Montero to cooperate with police in their investigation, just as it was possible to attempt to negotiate a plea agreement if the facts of the case warranted it. There was nothing wrong with Detective Adamson's telling Montero, "if you [are] cooperative and tell me everything you can . . . then I'll do whatever I can to help you out" and "if you . . . honestly didn't intend to kill that guy . . . then put that on the table . . . and we'll take that into account . . . and we'll talk to the D.A. about it . . . and we'll try to resolve it." *See Strain,* 779 P.2d at 225 ("The mere representation to a defendant by officers that they will make known to the prosecutor and to the court that he cooperated with them, . . . or appeals to the defendant that full cooperation would be his best course of action, [are] not coercive.") (citations omitted).

■ ¶ 16 We also see no problem with Detective Adamson's indication that "only about . . . 8 people" were outside in the area when the shooting took place, his suggestion that some of the witnesses had identified

Montero as the shooter, his assertion that witnesses placed the shooter in the back seat of a red SUV, or his claims that police would likely obtain compelling physical evidence connecting Montero to the crime. Montero argues that these were misrepresentations that led Montero to confess involuntarily. We disagree. "'A defendant's will is not overborne simply because he is led to believe that the government's knowledge of his guilt is greater than it actually is.'" *State v. Galli*, 967 P.2d 930, 936 (Utah 1998) (citation omitted). Indeed, we are not even convinced that Detective Adamson's statements can be fairly characterized as misrepresentations. Certainly, his suggestions that police *might* find physical evidence—DNA, fingerprints, gunpowder residue, etc.—connecting Montero to the shooting were not misrepresentations. And Eugene Spight's report to police at the scene that the shooter, a person named "Gumby" matching Montero's general description, had gotten into a red SUV provided support for Detective Adamson's assertions during the interrogation. Even if Detective Adamson stretched the truth somewhat or made one too many inferential leaps, his relatively few references to the evidence against Montero were insufficient to overbear Montero's will and cause him to confess involuntarily. *See id.* (finding "half-truths" insufficient "to overcome [the defendant's] free will and spirit"). *See also Rettenberger*, 1999 UT 80, ¶ 23, 984 P.2d 1009 (finding *"[e]xtreme* duplicity" sufficient to "raise serious doubt about [a confession's] reliability") (emphasis added).

¶ 17 Montero next argues that Detective Adamson's attempts to "recast the murder as a crime far less serious in nature" constituted trickery. Again, we disagree. Statements suggesting that a suspect may not have committed a homicide intentionally, or that a situation simply got out of hand, do not, standing alone, overcome a defendant's will such that his confession will be deemed involuntary. *See Rettenberger*, 1999 UT 80, ¶¶ 31–32, 984 P.2d 1009.

¶ 18 Montero insists that Detective Adamson's use of the false-friend technique, a technique whereby the interrogator represents that he is a friend acting in the sus-

pect's best interest, overcame his will. "Standing alone, [the false-friend] technique is not 'sufficiently coercive to produce an involuntary confession,' but may be significant 'in relation to other tactics and factors.'" *State v. Bunting*, 2002 UT App 195, ¶ 25, 51 P.3d 37 (citation omitted). As purported use of the false-friend technique, Montero points only to Detective Adamson's recurring suggestions to Montero to tell the truth, and his assurances that he would "do whatever [he] can to help [Montero] out." We have already explained that this is insufficient evidence to establish coercion.

¶ 19 Montero next asserts that Detective Adamson improperly subjected him to extended periods of incommunicado and that such conduct was especially egregious because he was left handcuffed to a chair. As we said above, we hardly think Montero was subjected to "extended" periods of anything, and other jurisdictions have recognized that restraining suspects with handcuffs is standard procedure. *See, e.g., United States v. Cardenas*, 410 F.3d 287, 295 (5th Cir.2005) (recognizing that "[s]uch basic police procedures as restraining a suspect with handcuffs have never been held to constitute sufficient coercion to warrant suppression"); *State v. Agnello*, 269 Wis.2d 260, 674 N.W.2d 594, 600 (Ct.App.2003) (recognizing as standard procedure the handcuffing of suspects when they are left alone "in order to prevent suicide attempts, escape, or property damage to the room"). Under the circumstances, we do not view Detective Adamson's conduct in this respect as being coercive.

¶ 20 Finally, Montero complains that he had nothing to eat and no restroom breaks, and that Detective Adamson brushed aside his requests to lie down and to call his mother, as well as his concerns about throwing up. We have thoroughly reviewed the interrogation transcript and the videotape, and we can see nothing to indicate that Montero ever asked for anything to eat or to use the restroom. With respect to his other complaints, Montero asked only once to lie down and to call his mother, and he never again mentioned a need to throw up after raising the possibility just once. Had he been truly exhausted or ill, he would have renewed his

requests, and Detective Adamson did nothing improper in temporarily brushing aside his call request, telling him that he could call his mother "in just a minute."

¶ 21 Because we must look at the totality of circumstances in determining whether Montero's confession was voluntary, we finally consider, in conjunction with the factors discussed above, the individualized factors of his mental and emotional health, education, age, and experience with the judicial system. Montero insists that he was a scared eighteen-year-old and a Venezuelan who does not speak English as his native language. But we see nothing in the record to suggest that Montero was in any way particularly susceptible to coercion or manipulation. Although he is fairly young, he has attended some college and speaks excellent English. He is also familiar with the legal system, given a criminal history—despite his comparative youthfulness—that includes convictions for possession of a firearm, obstruction of justice, theft, possession of a stolen vehicle, and disorderly conduct by fighting.

¶ 22 All of these facts notwithstanding, Montero asserts that Detective Adamson's interrogation tactics were sufficiently similar to those employed by law enforcement officers in *State v. Rettenberger,* 1999 UT 80, 984 P.2d 1009, as to justify suppression of his confession. We disagree. Detective Adamson's approach here was worlds apart from the unfairly manipulative techniques officers used in *Rettenberger.* There, for example, the eighteen-year-old defendant, who had never been arrested or interrogated by police before, confessed to capital murder after two interrogations spread across two days. Between the interrogations, he was placed in solitary confinement for over twenty-two hours with neither a blanket nor a pillow. His several requests for an attorney, to talk to his mother, and to use the telephone were all denied. His parents' request to provide legal counsel for him was denied outright. He was not permitted to use the restroom. Police made thirty-six false statements to him during the interrogation—not "merely 'half-truths' but ... complete fabrications about testimonial and physical evidence of [his] guilt." *Id.* ¶ 21. The officers also made

"significant references to ... the lethal consequences of being charged with capital murder, and the possibility of lesser charges being brought, depending on [his] cooperation." *Id.* ¶ 29 (internal quotation marks omitted). The Utah Supreme Court expressed concern "that a suggestive hypnotic interrogation technique may have been utilized," *id.* ¶ 36, and recognized that the officers' use of the false-friend technique was "ideally suited to extract an involuntary confession from certain types of suspects ... like [the defendant]," *id.* ¶ 26. And these are just the objective factors that led the Court in *Rettenberger* to hold that the defendant's confession there was involuntary.

¶ 23 Also contributing to the Court's decision were several facts unique to the defendant. He had a below average I.Q. and the maturity level of a fifteen-year-old. He suffered from attention deficit disorder and exhibited symptoms of depression, anxiety disorder, thought disorder, schizophrenia, and dependent personality disorder. An expert opined that he "would experience greater anxiety in solitary confinement than would the average person." *Id.* ¶ 6. She also testified that he "would be highly susceptible to psychological manipulation by police interrogators, that he would be overly compliant and dependent upon the police officers, and that he would tend to agree with the officers' statements during an interrogation in order to relieve his stress." *Id.* This proved correct, for the defendant's confession contained "little information that was not first provided or suggested by the interrogating officers." *Id.* ¶ 39. In fact, at times the defendant even "asked the officers for information about the crime" or "incorporated the officers' suggestions into his confession." *Id.* ¶ 42. These facts are in stark contrast to the facts of this case, which simply do not reach the level required for suppression of Montero's confession.

## CONCLUSION

¶ 24 The trial court did not err in declining to suppress Montero's confession. Detective Adamson's interrogation did not rise to the level of coercion. Neither the circumstances of the detention nor the length of the interro-

gation was coercive. Detective Adamson's exhortations to tell the truth and his assertions that Montero was lying were not inappropriately persistent or manipulative. We see no evidence of any improper threats or promises, and we are unpersuaded that any of Detective Adamson's other interrogation tactics overcame Montero's free will. Montero, an adult with an extensive criminal history, decided to take responsibility for his actions and voluntarily confessed.

¶ 25 Affirmed.

¶ 26 WE CONCUR: RUSSELL W. BENCH and JUDITH M. BILLINGS, Judges.