**2016 UT App 237**

# THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
JOSE LEIVA-PEREZ,
Appellant.

Opinion
No. 20141070-CA
Filed December 8, 2016

Eighth District Court, Vernal Department
The Honorable Clark A. McClellan
No. 131800050

Colleen K. Coebergh, Attorney for Appellant

Sean D. Reyes and Kris C. Leonard, Attorneys
for Appellee

JUDGE J. FREDERIC VOROS JR. authored this Opinion, in which
JUDGES MICHELE M. CHRISTIANSEN and JILL M. POHLMAN
concurred.

VOROS, Judge:

¶1     Jose Leiva-Perez appeals his conviction for murder, a first degree felony. He contends that police officers coerced a confession from him. We affirm.

BACKGROUND

¶2     Leiva-Perez, a Guatemalan national, shared a trailer with a male roommate (Victim) in rural Utah. In January 2013 Leiva-Perez called one of Victim's sisters and told her that Victim had been taken to a hospital, having been "really bad[ly] beaten" by four people. When Leiva-Perez "stopped answering" her calls,

the sister, who lived out of state, called local hospitals; none had any information on Victim. She then contacted Victim's other sister, who requested a welfare check from the County Sheriff's Office.

¶3     A deputy went to the trailer and knocked on the door but received no response. He peered through the blinds and saw that blood "had splattered up . . . the curtains and on the ceiling, [and] down on the comforter." He forced his way into the locked trailer, where he discovered Victim's frozen body lying face down. Victim's body showed blunt force trauma to the mouth, "extensive" bruising around the eyes, lacerations covering the face, and multiple skull fractures. Police found a large metal bar in the trailer. Victim's truck was gone. Police later found the truck and Leiva-Perez in California.

¶4     Police interrogated Leiva-Perez. He first told police that three Guatemalan men came to the trailer, went inside for "two, three minutes," and left. Leiva-Perez claimed that he entered the trailer after the three individuals had left and that he found Victim "face down . . . on the floor" and saw blood "on the blanket [Victim] slept on." Leiva-Perez said that when he entered the trailer, Victim said he was just "beaten up" and told Leiva-Perez to leave and take the car. According to Leiva-Perez, after he left, firefighters and ambulances arrived.

¶5     Police told Leiva-Perez that they had confirmed that no police, fire trucks, or ambulances had responded to Victim's trailer. They also told him that they had evidence that he had been inside the trailer at the time of the crime and that "something happened" between him and Victim. They said, "[W]e know this. Ok? And if you are truly repentant, you can tell us the truth." They continued, "[I]f you don't want to say the truth . . . [t]he penalty will be worse. The punishment will be worse, ok? You can say the truth, explain what happened and they can work with you when the time comes to go see a judge.

It will be less charges." When Leiva-Perez did not respond, officers told him, "[W]e understand, we won't think you are a horrible person . . . we all make mistakes." After Leiva-Perez reiterated that he did not kill Victim, police responded, "[I]f you talk to us, we will do a report, we will say that . . . you cooperated, that you spoke with us and you were honest." Police continued, "[T]here is a difference in the law, it is understandable when someone comes forth and stands tall for the mistakes they've made, versus someone who doesn't."

¶6 Leiva-Perez then changed his story. After acknowledging that "there was a little argument" between him and Victim, he asked police whether they had found any weapons in the trailer. After the officers said they did, Leiva-Perez said that Victim had threated to kill him and he "had to take action." After Victim threatened to "load [a] rifle with bullets and fill [him] with all of them," Leiva-Perez explained, he got mad and hit Victim three times with an iron bar. Police then asked Leiva-Perez whether he would write down his statement; he did. They then asked whether he felt that they had "forced [him] to say something that was not the truth," to which he responded "no."

¶7 Leiva-Perez later moved to suppress his confession on the ground that the police officers had coerced him to confess. At the suppression hearing, an expert qualified to discuss the Guatemalan justice system testified that a cultural mistrust of police and the concept of "personalism" caused Leiva-Perez to confess. The expert explained that in Latin America a statement such as "I know the judge, and I can talk to that judge and he'll give you a better deal" or "I know the judge and I can get you off" is a believable promise. Leiva-Perez argued that similar statements made by police during his interrogation led him to believe that if he confessed "the law would treat him differently than it would otherwise."

¶8     The trial court denied the motion to suppress. In concluding that Leiva-Perez's confession was not coerced, the trial court found that Leiva-Perez "did not have family or friends or counsel present during the interrogation" (though none were requested) and that "there were two threats of [harsher] punishment if [Leiva-Perez] did not change his story . . . ." However, the court also found that the interrogation lasted under two hours, that the officers "were not particularly persistent and the tone of the interview . . . was not unduly harsh," and that their "efforts to disabuse [Leiva-Perez] of his truthfulness [were] not excessive." It found that the officers "did not employ excessive attempts at deception [and] although there was some effort to use the false friend technique, the effectiveness of that device seemed to be mooted by the language barrier and by [Leiva-Perez's] personal view on police in general." Finally, the trial court found that Leiva-Perez showed "no evidence of any mental or emotional problems . . . [or] of a learning disability, except his demonstrably deficient public education of two or three years."

¶9     Leiva-Perez presented his coercion theory at trial. The jury convicted Leiva-Perez of murder, a first degree felony.


ISSUE AND STANDARD OF REVIEW

¶10    Leiva-Perez contends that the officers coerced him to confess in violation of his rights under the Fifth and Fourteenth Amendments to the United States Constitution. "In reviewing a trial court's determination on the voluntariness of a confession, we apply a bifurcated standard of review." *State v. Mabe*, 864 P.2d 890, 892 (Utah 1993). Under this standard, "the ultimate determination of whether a confession is voluntary is a legal question, and we review the trial court's ruling for correctness." *Id.* (citing *Arizona v. Fulminante*, 499 U.S. 279, 287 (1991)). But we "set aside a district court's factual findings only if they are

clearly erroneous." *State v. Rettenberger*, 1999 UT 80, ¶ 10, 984 P.2d 1009.[1]

ANALYSIS

¶11    The Fifth Amendment to the United States Constitution protects a person from being "compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. And "the Fifth Amendment's exception from compulsory self-incrimination is also protected by the Fourteenth Amendment against abridgment by the States." *Malloy v. Hogan*, 378 U.S. 1, 6 (1964). Analysis of "whether admission of a confession into evidence violates the Fifth or Fourteenth Amendment does not turn solely on the 'voluntariness' of the confession." *State v. Rettenberger*, 1999 UT 80, ¶ 11, 984 P.2d 1009. Rather, "coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary.'" *Colorado v. Connelly*, 479 U.S. 157, 167 (1986). But "as interrogators have turned to more subtle forms of psychological persuasion, courts have found the mental condition of the defendant a more significant factor in the 'voluntariness' calculus." *Id.* at 164. A defendant's mental state is therefore "relevant to the extent it made him more susceptible to mentally coercive police tactics." *Rettenberger*, 1999 UT 80, ¶ 17 (citation and internal quotation marks omitted). But "a defendant's mental condition, by itself and apart from its relation to official coercion," does not "dispose of the inquiry into constitutional voluntariness." *Connelly*, 479 U.S. at 164.

---

1. Leiva-Perez initially also argued that the trial court committed plain error by asking him in front of the jury whether he wanted to testify. At oral argument, however, Leiva-Perez conceded that our recent opinion in *State v. Saenz*, 2016 UT App 69, 370 P.3d 1278, forecloses this claim. Accordingly, we do not address it further.

¶12    "The ultimate goal of analyzing whether a confession was coerced is to determine 'whether, considering the totality of the circumstances, the free will of the witness was overborne.'" *State v. Arriaga-Luna*, 2013 UT 56, ¶ 9, 311 P.3d 1028 (quoting *United States v. Washington*, 431 U.S. 181, 188 (1977)). The totality of the circumstances includes "both the characteristics of the accused and the details of the interrogation." *Rettenberger*, 1999 UT 80, ¶ 14 (citation and internal quotation marks omitted). In analyzing the details of the interrogation, the court must consider "such external factors as the duration of the interrogation, the persistence of the officers, police trickery, absence of family and counsel, and threats and promises made to the defendant by the officers." *Id.*

¶13    In analyzing the characteristics of the accused, the courts must also consider subjective factors, including "the defendant's mental health, mental deficiency, emotional instability, education, age, and familiarity with the judicial system." *Id.* ¶ 15. Additionally, there must be "a causal relationship between the coercion and the subsequent confession." *State v. Mabe*, 864 P.2d 890, 893 (Utah 1993). As we determine the ultimate question of voluntariness under a "totality of circumstances" standard, we discuss each factor below. *See Rettenberger*, 1999 UT 80, ¶ 14 (citation and internal quotation marks omitted).

A.    Duration of the Interrogation

¶14    Although no specific time limit for a coercive interrogation exists, interrogations ranging from five to six hours have been held to be non-coercive. *See State v. Montero*, 2008 UT App 285, ¶ 12, 191 P.3d 828; *see also State v. Ashdown*, 296 P.2d 726, 729 (Utah 1956) (holding that a five and one-half hour interrogation was not coercive), *aff'd*, 357 U.S. 426 (1958).

¶15    The trial court determined that the "interview was conducted over a period of approximately 95 minutes," but due to the need for interpretation, "the actual amount of time spent

interrogating the Defendant was less than the ninety-five minutes." Leiva-Perez's 95-minute interrogation was significantly shorter than the six-hour interrogation in *Montero* that this court held was non-coercive. *See Montero*, 2008 UT App 285, ¶ 12. Leiva-Perez does not argue that the duration of the interrogation contributed to its coerciveness. We agree with the trial court that this factor weighs against a conclusion of coercion.

B.    Police Persistence

¶16    "[A] police officer's exhortations to tell the truth or assertions that a suspect is lying do not automatically render a resulting confession involuntary." *Id.* ¶ 13. "[W]e think it eminently reasonable that police officers challenge criminal suspects' questionable explanations in their pursuit of the truth and their efforts to solve crimes." *Id.* In *Montero*, this court held that the officers' approach was not coercive when, during an interrogation, they "repeatedly maintained that statements and evidence pointed to Montero as the shooter, . . . urged [Montero] to be a man[,] and suggested that [Montero] needed to take responsibility for his actions." *Id.* (internal quotation marks omitted).

¶17    Here, before Leiva-Perez confessed, police told him that they believed he was lying about his involvement in Victim's death. But the trial court determined that the officers' "efforts to disabuse [Leiva-Perez] of his truthfulness was not excessive." The officers' accusation against Leiva-Perez of lying three times during the roughly hour-and-a-half interrogation does not constitute "'systematic persistence' sufficiently egregious to suggest coercion." *See id.* (quoting *Harris v. South Carolina*, 338 U.S. 68, 71 (1949)).

¶18    The trial court also found that the "officers were not particularly persistent and the tone of the interview, at least as provided in the written transcript, was not unduly harsh." Leiva-Perez does not challenge the persistence of police

questioning as coercive, and we agree with the trial court that the "persistence demonstrated by the officer was of the type and nature that . . . is consistent with appropriate police activity."

C.      False-Friend Technique

¶19     In employing the false-friend technique, "officials 'represent[] to [a defendant] that they [are] his friends and that they [are] acting in his best interest.'" *State v. Bunting*, 2002 UT App 195, ¶ 25, 51 P.3d 37 (alterations in original) (quoting *State v. Rettenberger*, 1999 UT 80, ¶ 24, 984 P.2d 1009). "[S]tanding alone," the false-friend technique is not "sufficiently coercive to produce an involuntary confession." *Rettenberger*, 1999 UT 80, ¶ 28. "The significance of the stratagem comes in relation to other tactics and factors." *Id.* The false-friend technique may be coercive if a defendant has "below-average cognitive abilities" or other cognitive disabilities. *Id.* ¶ 26. In *Rettenberger*, our supreme court held that because the defendant "suffer[ed] from mental disabilities and deficiencies," the effect of the false-friend technique was heightened "in relation to other tactics and factors" and contributed to the coercive nature of the police interrogation. *Id.* ¶ 28. A defendant "parrot[ing] . . . suggestions" of criminal activity initially provided by police may indicate that a defendant is particularly susceptible to the false-friend technique. *See Bunting*, 2002 UT App 195, ¶ 26.

¶20     In *State v. Montero*, we determined that recurring suggestions to a defendant to tell the truth coupled with assurances that the interrogating officer would do whatever he could to help the defendant did not establish coercion. *See Montero*, 2008 UT App 285, ¶ 18. Here, police made similarly innocuous representations to Leiva-Perez, explaining that they "want[ed] to be able to work" with him, and that they thought he was "a good person."

¶21     The trial court found that the officers "did not employ excessive attempts at deception" but did employ "some effort to

use the false friend technique." The trial court determined that the "language barrier" and Leiva-Perez's "personal view on police in general" blunted the effect of the false-friend technique. The trial court saw "no evidence of any mental or emotional problems . . . [or] of a learning disability, except his demonstrably deficient public education of two or three years." Because Leiva-Perez did not demonstrate "below-average cognitive abilities" or "mental disabilities and deficiencies," employing the false-friend technique did not heighten police coercion "in relation to other tactics and factors." *See Rettenberger*, 1999 UT 80, ¶ 28. In addition, the record contains no indication that Leiva-Perez "parrot[ed] any suggestions" by the officers. *See Bunting*, 2002 UT App 195, ¶ 26. In fact, Leiva-Perez himself alerted police to the murder weapon, which they collected from Victim's trailer after Leiva-Perez confessed to hitting Victim with the metal bar. We thus agree with the trial court that this factor weighs against a conclusion of coercion.

D.    Police Misrepresentations

¶22    "[A] defendant's will is not overborne simply because he is led to believe that the government's knowledge of his guilt is greater than it actually is." *State v. Galli*, 967 P.2d 930, 936 (Utah 1998) (citation and internal quotation marks omitted). Generally, police "half-truths regarding the strength of the evidence" against a defendant are not "sufficient to overcome [a defendant's] free will and spirit." *Id.*

¶23    The trial court here determined that, aside from the use of the false-friend technique, the police "did not employ any other alleged deception . . . during the interview." Leiva-Perez does not claim police misrepresentations, and the record does not indicate that police exaggerated the strength of the evidence against him. We thus agree with the trial court that this factor weighs against a conclusion of coercion.

E.      Threats or Promises

¶24   "An interrogation can be impermissibly coercive because [it] carried a threat of greater punishment or a promise for lesser punishment depending on whether [a defendant] confessed." *Rettenberger*, 1999 UT 80, ¶ 29 (alterations in original) (citation and internal quotation marks omitted). Further, a promise of leniency necessarily implies a threat of a harsher punishment. *Id.* ¶ 30. But "even *strong suggestions* that a defendant might not face a particular charge or punishment if he confessed 'standing alone, may not . . . overcome [a defendant's] will' but may 'constitute evidence that, when considered in light of the totality of the circumstances, strongly weighs against the conclusion that the confession was voluntary.'" *Bunting*, 2002 UT App 195, ¶ 23 (quoting *Rettenberger*, 1999 UT 80, ¶ 32). Finally, the "mere representation to a defendant by officers that they will make known to the prosecutor and to the court that [the defendant] cooperated with them . . . ha[s] been recognized as not coercive." *State v. Strain*, 779 P.2d 221, 225 (Utah 1989).

¶25   Leiva-Perez maintains that "the combination of threats of harsher punishment, a promise that there could be leniency, and that the Judge would be contacted . . . on Leiva-Perez's behalf induced [Leiva-Perez] to change his version of events and ultimately confess."

¶26   *Rettenberger* involved coercive threats and promises. Rettenberger was charged with murder and aggravated robbery following his confession to killing the victim during the commission of the robbery. 1999 UT 80, ¶¶ 1–3. During his interrogation, "the officers suggested to Rettenberger that the murder could be recast as a crime far less serious in nature than capital homicide." Police also stated that if Rettenberger did not choose to confess, he would be "looking at lethal injection . . . firing squad, . . . [or] hanging." *Id.* ¶¶ 30–31. Police emphasized that if Rettenberger confessed, he would not "have

to die" and he would not "have to spend the rest of [his] life in prison." *Id.* ¶ 29. The supreme court determined that the statements, considered in light of the totality of circumstances, "strongly weigh[ed] against the conclusion that the confession was voluntary." *Id.* ¶ 32.

¶27 *Bunting* and *Montero*, on the other hand provide examples of interrogation techniques that were not so coercive as to overcome the defendant's free will. In *Bunting*, we determined that the defendant's "free will was not overcome by any threats or any suggestions of leniency" when police "told Defendant that he was going to be charged with premeditated, first degree murder" and implied that defendant "could avoid a premeditated murder charge if he offered an unintentional, negligent or reckless explanation for [the victim's] death." *Bunting*, 2002 UT App 195, ¶ 24. Similarly, in *Montero*, we determined that "factually accurate statements" that the defendant "could end up going to jail" and "still be an accessory to murder" did not constitute coercive behavior to render defendant's confession involuntary. *State v. Montero*, 2008 UT App 285, ¶ 14, 191 P.3d 828 (internal quotation marks omitted).

¶28 Here, the officers' statements fell short of "strong suggestions that [Leiva-Perez] might not face a particular charge or punishment if he confessed." *See Bunting*, 2002 UT App 195, ¶ 23 (emphasis omitted). However, without referencing *specific* charges, police did tell Leiva-Perez that if he did not tell the truth "the penalty" and "punishment" would "be worse." The officers also stated that "there is a difference in the law, it is understandable when someone comes forth and stands tall for the mistakes they've made, versus someone who doesn't."

¶29 Though troublesome, these statements do not rise to the level of the threats made in *Rettenberger*. There, police referred to the methods of execution that the defendant potentially faced, including lethal injection, firing squad, and hanging. *See*

*Rettenberger*, 1999 UT 80, ¶¶ 30–31. Nor do the statements that officers made to Leiva-Perez rise to the level of the specific reference to "premeditated, first degree murder" that this court determined in *Bunting* was not so coercive as to overcome the defendant's free will. *See* 2002 UT App 195, ¶ 23. Here, the officers' vague references to "difference[s] in the law" and the potential for fewer charges to be brought if Leiva-Perez confessed do not indicate that his "free will was . . . overcome by any threats or any suggestions of leniency." *See id.* ¶ 24.

¶30    But even if police did make an impermissibly coercive threat to Leiva-Perez, we cannot conclude that this threat induced Leiva-Perez to confess. There must be "a causal relationship between the coercion and the subsequent confession." *State v. Mabe*, 864 P.2d 890, 893 (Utah 1993). Leiva-Perez maintained his original narrative about his lack of involvement with Victim's death even after police explained that the penalty might be worse if Leiva-Perez did not confess. Leiva-Perez divulged information about killing Victim with a metal bar only after asking police whether they found weapons in the trailer and the officers confirmed that they had found a gun. This sequence of events suggests that the officers' representations about potential charges or penalties likely did not induce his confession. We thus agree with the trial court that "there is no evidence that the defendant's will was overcome."

F.    Subjective Factors

¶31  Finally, we consider Leiva-Perez's "subjective characteristics, especially as known to the interrogating officers, to determine the extent to which those characteristics made him more susceptible to manipulation." *See Rettenberger*, 1999 UT 80, ¶ 37. "A confession may be suppressed in circumstances in which a police officer knows of a suspect's mental illness or deficiencies at the time of the interrogation and effectively exploits those weaknesses to obtain a confession." *Id.* ¶ 18. In

*Montero*, although the defendant argued that "he was a scared eighteen-year-old and a Venezuelan who does not speak English as his native language," we did not see anything in the record "to suggest that Montero was in any way particularly susceptible to coercion or manipulation." *Montero*, 2008 UT App 285, ¶ 21.

¶32 Leiva-Perez maintains that he "was inarguably uneducated and unsupported" and his "upbringing in Guatemala would have him left with a strong conviction that persons who can get someone to intercede with a judge on their behalf would get leniency, and those who could not would fall through the cracks, and potentially be incarcerated indefinitely without trial." Although the trial court found that the officers knew of Leiva-Perez's "demonstrably deficient" education, it found no indication, nor has Leiva-Perez pointed us to any portion of the record to demonstrate, that officers "had any understanding of the political history or of the justice system in Guatemala." In *State v. Maestas*, we emphasized that "an officer's knowledge of subjective mental infirmities could make the officer's actions sufficiently coercive, if there is evidence that he has exploited them." 2012 UT App 53, ¶ 36, 272 P.3d 769. Here, we see nothing in the record to suggest that the officers attempted to exploit Leiva-Perez's subjective beliefs about the Guatemalan justice system or even that they were aware of those beliefs. Further, Leiva-Perez acknowledged that he was not under the impression that the "same characteristics [of Guatemalan police] apply to the police in the United States," stating that "what happens [there is] very different from here, what happens there is manipulation because of money."

¶33 The trial court also emphasized that Leiva-Perez, "although uneducated, is not suffering from any mental deficiency or emotional instability that affects his ability to understand what is happening to him," that he is "capable of writing Spanish and communicating reasonably well in his

native language in writing," and that he can "think critically and respond appropriately to questions that are asked of him." Because we see "nothing in the record to suggest that [Leiva-Perez] was in any way particularly susceptible to coercion or manipulation" due to his unique characteristics, we decline to disturb the trial court's findings.

## CONCLUSION

¶34    Examining a totality of the circumstances, we see no error in the trial court's ruling that Leiva-Perez's confession was not coerced. The judgment of the trial court is accordingly affirmed.

———————